2018 PA Super 359

| KATHRYN F. LEIGHT AND JOHN L. LEIGHT, HER HUSBAND, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellants | : | |
| v. | : | |
| UNIVERSITY OF PITTSBURGH PHYSICIANS, UPMC, UNIVERSITY OF PITTSBURGH OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, SUSAN SHICK, AND PHILLIP L. CLARK, ADMINISTRATOR OF THE ESTATE OF JOHN F. SHICK, DECEASED | : | No. 1912 WDA 2017 |

Appeal from the Order Entered December 15, 2017
in the Court of Common Pleas of Allegheny County,
Civil Division at No(s): No. GD12-9942

BEFORE: BENDER, P.J.E., LAZARUS, J., and MUSMANNO, J.

OPINION BY MUSMANNO, J.: FILED DECEMBER 31, 2018

Kathryn F. Leight ("Kathryn") and John L. Leight, her husband (collectively "the Leights"), appeal from the Order dismissing with prejudice all of their claims against UPMC and University of Pittsburgh of the Commonwealth System of Higher Education ("Pitt"), thereby allowing the Leights to file an appeal from the Order sustaining the Preliminary Objections filed by Pitt and University of Pittsburgh Physicians ("UPP"), and dismissing the Leights' Mental Health Procedures Act ("MHPA") claims.[1] We affirm.

_____

[1] The Leights' other claims against Susan Shick ("Susan"), John F. Shick's ("Shick") mother, and Phillip L. Clark, Administrator of the Estate of John F.

This appeal arises from the March 8, 2012 shooting incident, wherein Shick killed one person and injured several others, including Kathryn, at Western Psychiatric Institute and Clinic ("WPIC"). In the Leights' Second and Third Amended Complaints,[2] they pleaded the following, in relevant part:

> 28. … [A]t all times that each and every physician who was an employee, servant and/or agent of Defendants UPMC, UPP and/or Pitt provided medical services to Shick as described below, they and each of them had the ability to access all of Shick's medical records documenting treatment provided by all physicians who were the agents, servants and/or employees of Defendants UPMC, UPP and/or Pitt.
>
> 29. Unless otherwise stated below, Shick's Pennsylvania treating physicians and their practices' respective staff members and administrators were the agents, servants and/or employees of Defendants UPMC, UPP and/or Pitt at all times pertinent to this cause of action, and those physicians identified as resident physicians were the employees of Defendant Pitt.
>
> 30. In 2007, [Kathryn] began and continued to perform the functions of the outpatient receptionist in the [WPIC] lobby. …
>
> 49. On February 24, 2005, Shick first engaged in behaviors causing peace officers and physicians to believe that he was suffering from severe mental illness causing him to be an imminent threat of danger to himself or others, requiring his involuntary treatment in a psychiatric hospital, including the involuntary administration of antipsychotic medications. …

_____

Shick, deceased, were disposed of in prior Orders. We further note that while UPMC had filed the Preliminary Objections at issue in this case with Pitt and UPP, UPMC is not a party to this appeal. Indeed, the Leights filed a Notice of Non-Participation, stating that Susan, Phillip L. Clark, and UPMC had no interest in the outcome of this proceeding.

[2] In their Third Amended Complaint, the Leights incorporated the vast majority of their averments in their Second Amended Complaint, and substituted or added six averments. Thus, we will cite to both Complaints in addressing this appeal.

51. On that date, Shick, then 24 years old, was brought to the St. Luke's - Roosevelt Hospital ("St. Luke's") emergency room in handcuffs by emergency medical providers and members of the New York City Police Department ("NYPD"), where he was placed in restraints and medicated intramuscularly in the psychiatric emergency room due to his uncooperative and combative behaviors, including attempts to elope (run away) from the facility. ...

53. Involuntary [c]ourt[-]approved commitment and involuntary antipsychotic medication proceedings were initiated, and both were approved and began. ...

60. On April 27, 2005, the antipsychotic medication had improved Shick's condition to the point that he was much less paranoid, was no longer an acute danger to himself or others, was stable for discharge, and Shick agreed to be followed by the Mobile Crisis Team at his home to ensure his apartment would be in livable condition, and to undergo further treatment at Metropolitan Center for Mental Health. ...

62. [On May 3, 2005,] Shick was again taken to St. Luke's ER, where he was offered and spit out oral Risperdal, and he was again involuntarily committed and medicated intramuscularly, and the emergency room psychiatrist signed applications for his involuntary commitment and treatment, as he was a danger to himself and others.  ...

85. ... Susan and Shick became aware of his need to undergo ongoing psychiatric treatment, including an appropriate antipsychotic drug regimen, in order to control his schizophrenia and prevent him from being a danger to himself or others.  ...

89. Shick was involuntarily committed to the New York-Presbyterian Cornell Medical Center [], where he remained under court[-]ordered involuntarily treatment, including involuntary antipsychotic medication administration, until June 10, 2008.  ...

101. In April 2009, Shick was admitted to [the Chemistry Ph.D. program at Portland State University in Oregon] as a student and graduate teaching assistant for the Fall 2009 quarter, and moved to Portland.  ...

117. Shick was involuntarily treated, including involuntary administration of antipsychotic medications at [Providence Portland Medical Center] until February 10, 2010, when he was transferred for additional inpatient psychiatric care at Blue Mountain Recovery Center, a state mental institution located in Pendleton, Oregon. ...

120. Shick was discharged from Blue Mountain on May 12, 2010, .... ...

138. On March 30, 2011, Shick was accepted into the [Duquesne University Doctoral] program [in the Department of Biological Sciences], and was granted a graduate teaching assistantship. ...

140. On June 23, 2011, Shick began to establish a patient-primary care physician relationship with UPP doctors at UPMC Shadyside Family Health Center ("Shadyside Family").

141. Shick provided Shadyside Family with the requested executed authorization to obtain the records of his most recent treating physician, Barry Egener, M.D., from LMG Northwest Clinic [("LMG")] in Portland, Oregon.

142. Shadyside Family staff requested and LMG staff provided Shick's treatment records to Shadyside Family on July 13, 2011.

143. From review of the LMG records, it was apparent that on Shick's first visit with LMG on April 14, 2011, Shick claimed to have been diagnosed with depression, and did not take sufficient medication to efficaciously treat that condition. ...

147. On July 22, 2011, nine days after Shadyside Family's receipt of the LMG records, Shick was evaluated as a new patient by the resident family practice physician assigned to that task by UPP at Shadyside Family, Thomas Weiner, M.D., with complaints of neck and ankle pain, elevated cholesterol and depression.

148. Dr. Weiner, as all residents in the practice did, at least briefly conferred with an experienced physician designated to monitor the residents' progress and training before referring Shick to physical therapy and a UPP pain management practice, prescribing non-steroidal anti-inflammatory medication, a muscle relaxer, and continuation of previously[-]prescribed Prozac.

149. On August 16, 2011, Shick ... returned to be seen by Dr. Weiner, complaining of neck, shoulder and ankle pain and seeking narcotics, for which he was again prescribed physical therapy. ...

155. ... [O]n September 22, Shick was again seen by Dr. Weiner, with complaints of chest and neck pain, belching, vomiting and depression.

156. Dr. Weiner ordered an electrocardiogram, again referred him to pain management, and ordered a calcium channel blocker used to relax the muscles of the heart and blood vessels. ...

160. Shick was next evaluated by Dr. Weiner six days later[,] on October 17, 2011, with complaints of severe headaches, neck and back pain, stable depression, and requesting cholesterol level blood testing.

161. Dr. Weiner detected an unusual optic disc in Shick's eye during examination, referred Shick to an ophthalmologist for further evaluation, ordered Imitrex, which narrows blood vessels around the brain to treat migraine[s], ordered the requested blood testing, and again referred Shick to pain management for the neck and back pain.

162. On that date, Dr. Weiner first recorded his impression that the pain complaints might be due to mental illness, that another psychiatric diagnosis besides depression was very likely, that he was unsure of the primary psychiatric diagnosis, and that Shick may benefit from a psychiatric referral at some point. ...

172. Three days later, on October 24, 2011, Shick was first seen by UPP pain management specialist Edward Heres, M.D.[,] of UPMC Pain Management, with complaints of pain in his chest, back and shoulder, claiming that the pain began after a heart event one year previously, his personal care physician would not write any more medication for him, and seeking a prescription for the narcotic pain analgesic Hydrocodone.

173. Dr. Heres reviewed Shick's past medical history on UPP's electronic system, including the depression diagnosis, noted that the patient's affect was flat, and noted the inconsistency between the pain complaints and his examination.

174. Dr. Heres changed Shick's [non-steroidal anti-inflammatory drug] medication and recommended trigger point injections for diagnostic and treatment purposes, which Shick underwent in his right trapezius and deltoid on October 31, 2011.

180. On November 4, 2011, Shadyside Family staff set up an appointment for Shick to be evaluated by [WPIC] personnel.

181. On November 9, 2011, Shick underwent a psychiatric diagnostic evaluation by a [WPIC] licensed clinical social worker.

182. Shick denied prior psychiatric treatment, was a very poor historian, was very guarded and disconnected, and reported severe pain all over because he wanted a wife.

183. Shick denied a long list of prior psychiatric history symptoms or diagnoses with a very animated smile and stating "thank you for asking" in response to each of those questions.

184. Shick ... stated that a psychologist friend had told him that he was bipolar.

185. Shick acknowledged that he had been discharged from the Duquesne program as the result of harassment charges because of unacceptable interactions with women ....

186. Shick stated he was there for male erectile dysfunction and wanted medications to address that problem.

187. The social worker encouraged him to follow up with his PCP for that medication, but Shick said his PCP was out of town and he needed to see a psychiatrist.

188. Shick signed the requested authorization allowing [WPIC] personnel to communicate with Susan, and received a November 28 appointment with a [WPIC] psychiatrist.

189. The next day, November 10, Shick called Shadyside Family seeking pain alleviation.

190. After consulting with Dr. Weiner, the Shadyside Family staff member called Shick, advised him of his elevated cholesterol levels, that he should keep his appointment with the psychiatrist,

and that Dr. Weiner had refused his request to prescribe pain medication or increased dosages of statin medications. ...

193. ... [O]n November 14, Shick was seen by UPP family practice resident physician Juan Bautista, M.D.[,] at Shadyside Family. ...

194. Dr. Bautista ordered comprehensive blood and urine testing, ordered [] Celebrex, gave Shick a consult to the UPMC pain clinic, ordered the histamine-2 blocker Zantac for treatment of reflux, recommended a return in three days, and refused the requested kidney test.

195. Dr. Bautista's treatment note expressed concern over the patient's statement about getting fired from his job since he was recorded as being unemployed on the chart, and refused the request for a Prozac refill because the chart indicated he had remaining refills available for one year.

196. [On] November 15, 2011, Shick called Shadyside Family seeking his test results.

197. Later that day, Shick called Shadyside Family requesting a Flexeril refill from Dr. Weiner, which the nurse refilled on the order of the doctor covering in Dr. Weiner's absence.

198. ... [O]n November 17, Dr. Bautista called Shick, spoke with him, advised [him] of abnormal test results indicating elevated cholesterol and potassium levels, agreed to and did send Shick written notice of the abnormal blood work and, in response to Shick's complaint that bills from that practice had been sent to Shick under the wrong name, Shick was referred to billing.

199. The next day, November 18, Shick called Shadyside Family asking for a referral to dermatology.

201. Four days later, on November 25, Shick went to the emergency room at 1 UPMC Magee Woman's Hospital with gastrointestinal complaints, including belching and vomiting, as well as various upper body pains, was agitated, rude and uncooperative with the staff, and demanded multiple radiological and blood tests.

202. Shick ... was referred to the UPMC gastrointestinal clinic.

203. The next day, November 26, Dr. Weiner called and spoke with Shick to advise him of his elevated cholesterol and slightly elevated potassium levels in his blood work results.

204. Dr. Weiner noticed Shick's pressured speech and encouraged him to be treated by a psychiatrist, which Shick rejected.

205. Two days later, on November 28, Shick underwent the recommended evaluation by UPP psychiatrist Jatinder Babbar, M.D.[,] at Western Psych.

206. Shick denied prior psychiatric treatment, answered almost no questions in a straightforward manner, had very poor insight and disorganized thoughts, and denied suicidal or homicidal ideations.

207. Dr. Babbar called Susan, who advised that Shick had five prior psychiatric admissions, including one for three months in Portland in 2010.

208. Because Susan advised that Abilify and individual psychiatric therapy had been effective in the past, Dr. Babbar strongly encouraged Shick to start that medication and begin therapy, which Shick refused to do[,] and left. …

209. Dr. Babbar furnished Susan with the numbers for the [WPIC] clinic and for resolve, the program within [WPIC] that, among other functions, takes and responds to calls about involuntary civil commitments, and sends mobile teams to evaluate and transport individuals requiring the same.

210. Dr. Babbar diagnosed Shick as being schizophrenic and noncompliant with his medications.

211. Shick was then scheduled for further psychiatric evaluation and treatment by Konsale Prasad, M.D.[,] of UPP's Department of Psychiatry.

212. The next day, November 29, Dr. Weiner called from Pennsylvania and first spoke with Susan, who advised that Shick had been diagnosed as schizophrenic, had seen Dr. Babbar, but refused to be treated by him again.

213.   On that same day, Dr. Weiner sent an email to UPP psychiatrist Stephanie Richards, M.D., who was on the staff of Shadyside Family, explaining[ Shick's behavior.]  ...

219. A week later, on December 20, pursuant to the ER doctor's referral, Shick was seen by Christine Gulati, M.D.[,] of UPP's Division of Gastroenterology, Hepatology & Nutrition, self-diagnosing a duodenal ulcer due to episodes of vomiting his Zantac and aspirin (but not the Prozac), as well as excessive gas, belching, nausea, abdominal pain, and a history of depression, requesting a prescription for the anti-ulcer medication Carafate. ...

221. On that same day, Shick was seen by Jody Maranchie, M.D. [("Dr. Maranchie")] of UPP's Department of Urology, with complaints of an elevated potassium test result, intense bilateral lower quadrant pain that he attributed to passing kidney stones, as well as a history of gastroesophageal reflux disease, an ulcer, migraine headaches, chronic muscle back spasms, "ischemic stroke" resulting in left ankle pain, and intermittent chest pain, but no evidence of myocardial infarction.

222.   Dr. Maranchie performed a physical examination and reviewed Shick's laboratory data, advised Shick (and noted to Dr. Weiner) that there was no evidence of urologic pathology.  ...

225. [On] December 23, Shick was seen by Dr. Weiner about his one[-]time elevated potassium level, with Shick stating his belief he had the ability to control his own potassium level, and with complaints of regular severe headaches and pain, which he was unable to characterize.

226. Shick accused Dr. Weiner of being like his mother in asking about the pain, and said he could only articulate his pain in essay form, which he would provide to Dr. Weiner in February, and would appreciate it if Dr. Weiner would edit it.

227. Dr. Weiner recommended that Shick begin taking anti–psychotic medication, with Shick responding in a grandiose and dismissive fashion, both as to Dr. Weiner and as to Dr. Babbar.

228. Dr. Weiner recognized that the body pain complaints were "most likely" psychosomatic due to Shick's schizophrenia, referred him to Dr. Richards[,] and recommended anti-psychotic

medications, all of which Shick refused, while continuing to deny his schizophrenia and prior treatment for it.

[234-271. Detailing Shick's contact with various UPP physicians between December 29, 2011, and January 23, 2012.]

272. ...[O]n January 25, Shick was first evaluated by UPP primary care physician James Jarvis, M.D. [("Dr. Jarvis"),] of Stull, Jarvis and Spinola Internal Medicine Associates-UPMC with complaints of ankle pain, two ischemic strokes, diabetes, pancreatic and liver diseases and peptic ulcer disease, indicated his belief that Simvastatin provided him pain relief, and requested a prescription for the pain treatment drug Tramadol.

273. Dr. Jarvis checked the chart, recognized that Shick's overriding defect was clearly psychiatric in nature, and refused to treat the patient, referring him to the doctors who had ordered the numerous tests so that he could obtain the test results.

274. On that same date, Shick went to undergo the CT scan recommended by Dr. [Swaytha] Ganesh and refused the prescribed iodinated contrast study; after consultation with the radiologist, Dr. Ganesh ordered the scan to proceed without contrast, and that occurred. ...

276. Dr. Weiner noted that the patient was "floridly psychotic at the moment," will discuss with psych, "I do not think he meets criteria for [involuntary commitment] but will discuss this with them; patient believes he suffered an 'ischemic stroke' and this was due to inadequate statin dose." ...

278. [On] February 2, Shick initiated treatment with UPP family practitioner Ya'aqov Abrams, M.D. [("Dr. Abrams")] from Squirrel Hill Family Health Center with complaints of vomiting and abdominal pain, and requesting specific testing for treatment of his self-diagnosed pancreatitis and diabetes.

279. On that date, Dr. Abrams, using an authorization executed by Shick and information provided by him, had available for review copies of Shick's prior medical records from another Portland physician, Dr. Iverson, reflecting the depression diagnosis, which had been received on January 29. ...

284. Two days after Shick's visit with Dr. Abrams, on February 4, Shick went to the UPMC Presbyterian Hospital emergency department, complaining of nausea, abdominal pain, vomiting and "white stringy things" in his stool.

285. The UPP ER doctor reviewed the patient's UPMC chart, recognized the multiple previous medical interactions, that the patient had not been engaged in any activities or been in any locations where parasitic infections would be likely, and found no support for the same on physical exam. ...

287. The next day, February 5, Shick went to the UPMC Presbyterian Hospital emergency room with complaints of nausea and vomiting and worms in his stool, was given Zofran for the nausea, and he then refused further evaluation or taking of vital signs and left.

288. The next day, February 6, Shick was evaluated by UPP podiatrist Patrick Burns, D.P.M., with complaints of a hole in his left ankle, causing him problems with running and walking, ... and requesting prescriptions for Lisinopril, Simvastatin and home oxygen.

289. Shick also advised Dr. Burns that he had undiagnosed diabetes, recurrent transient ischemic attacks, a possible cerebrovascular accident, possible chronic obstructive pulmonary disease, high cholesterol, vascular disease, peripheral arterial disease, nausea, puss on his abdomen (which was not there), migraines, fluid in his ears, coughing with blood in his sputum, diarrhea and change in the texture of his stools. ...

291. Based upon previous x-rays, Dr. Burns confirmed the existence of an osteocondrolesion of the left talus in Shick's ankle, explained that Shick's vascular supply was good and the testing he requested was inappropriate, refused Shick's requests for prescription medications or home oxygen, and referred him back to his PCP.

292. ... [O]n February 8, Shick returned to see Dr. Abrams with complaints of diabetes and demanding Glucotrol.

293. Dr. Abrams explained that his recent lab results did not confirm Shick's suspicion of diabetes and asked if he would

consider a referral to a psychiatrist, at which point Shick became angry and left the office.

294. On that same date, Shick sent Dr. Ganesh a letter advising the doctor to be very careful this February.

295. The next day, February 9, Shick returned to be seen by Dr. Kirby, demanding testing.

296. Dr. Kirby's impression was that Shick was acutely psychotic, delusional, but not threatening, the patient refused psychological evaluation or medications, and will monitor for commitment.

297. Dr. Kirby determined [sic] to speak with Shadyside Family's director, UPP family practitioner Gregory Gallick, D.O.

298. Dr. Gallick spoke with Philip Phelps [("Phelps")], Defendant UPMC's Director of Behavioral Science curriculum, about involuntary mental health evaluation and treatment commitment, with [] Phelps advising that Shick was not a current candidate.

299. Later that day, Shick called Shadyside Family and reported to the nurse that he went to pick up prescriptions from the pharmacy that Dr. Kirby had ordered but none were there; Dr. Kirby documented that he did not order new prescriptions, the patient is acutely psychotic and delusional, and he tried to call Shick but received no answer.

300. The next day, Friday, February 10, Shick appeared at Shadyside Family to have blood drawn for testing, and inappropriately brandished a baseball bat in a threatening manner, causing the nurse to be upset. …

303. Dr. Weiner advised [resolve's Jeffery Mcfadden ("McFadden")] that Shick had come into Shadyside Family that morning, banged a baseball bat on the counter, waved it around in a threatening manner, had been increasingly psychotic and intimidating in recent visits, believed he could control the electrolytes in his body, has various nonexistent diseases, and that UPMC security was called and removed Shick from the premises. …

304. [] McFadden dispatched a mobile team from resolve to pick up Shick and take him to [WPIC] for a mental health wellness check and possible commitment. ...

307. The mobile team met with Shick and attempted to assess him, but he refused, obtaining the assessor's name, advising that they were not welcome and shut the door to his apartment. ...

321. [On February 17, 2012, a]t 11:35 a.m., Dr. Weiner called resolve and spoke with clinician Nedra Williams, asking to have involuntary commitment papers faxed to him to accomplish the involuntary commitment of Shick.

322. The clinician informed Dr. Weiner that Western Psych does not fax involuntary commitment papers, and suggested that Dr. Weiner go to Western Psych to fill out the forms.

323. At 12:51 p.m., one of the Shadyside Family staff members called and spoke with resolve clinician Amanda Dunmire, requesting information on the involuntary commitment process, and how a doctor completes an involuntary commitment form, which information was provided. ...

329. Two days later, on February 20, Shick was evaluated by UPP orthopedic foot & ankle surgeon Victor Prisk, M.D. [("Dr. Prisk"),] with a similar history to the one given to Dr. Burns on February 6, but adding an additional stroke that morning. ...

331. Shick admitted to depression but denied any other psychiatric problems, and wrote the word "green" on the psychiatric intake sheet.

332. Dr. Prisk recognized that Shick clearly had uncontrolled schizophrenia upon examination and review of his medical records, and really needed psychiatric care.

333. Dr. Prisk made an effort to contact personnel he referred to as "the case managers" for psychiatric help, who he documented were unable to come. ...

335. On that same day, February 20, at 3:55 p.m. Dr. Kirby called, on an emergent basis, and spoke with resolve clinician Valerie Krieger, seeking assistance to have Shick involuntarily committed. ...

341. Dr. Kirby did not attempt to or file a commitment petition the next day or at anytime thereafter. ...

350. One week after he had failed to file the commitment papers, on Tuesday, February 28, Dr. Kirby sent Shick a letter on behalf of Shadyside Family notifying him that the practice would no longer provide medical care to him effective thirty days from that date.

351. A week later, on March 7, Shick called for and received emergency care at his residence for his complaints of shortness of breath, vomiting blood[,] and parasites in his intestines and eyes.

352. Shick was taken to UPMC Presbyterian Hospital's emergency department, where he repeated that history, demanded pain medication, refused to discuss his medications with the examining physicians, and left.

353. The next day, March 8, 2012, Shick went to Western Psych.

354. He brought with him loaded Makarov and Beretta 9mm semiautomatic handguns and extra ammunition he had purchased a year previously in New Mexico.

355. In the unguarded Western Psych lobby, he shot and injured [Kathryn] at the unprotected receptionist's desk, and shot several other people, killing one of them, before he was himself shot and killed by an armed Pitt police officer stationed nearby, but not in or assigned to Western Psych, who responded to reports of the incident.

356. As the direct result of the bullets Shick fired at and into [Kathryn], she suffered physical injuries in the nature of gunshot wounds to the left chest and abdomen, including entry wounds there and exit wounds from her back, and related internal injuries to her muscles, ligaments, nerves and internal organs, and complications including pneumothorax and respiratory failure.

357. As the direct result of her receipt of appropriate treatment for her bullet wounds, including intubation and exploratory surgery, it was necessary for [Kathryn] to undergo significant emergency and long term initial and subsequent hospitalizations,

surgeries and other medical procedures, nursing care and treatment.

358. [Kathryn] also suffers from severe post-traumatic stress disorder as the direct result of the shooting.

Second Amended Complaint, 9/16/13, at ¶¶ 30-358; Third Amended Complaint, 2/25/14, at ¶¶ 28-29, 238, 245.

On June 6, 2012, the Leights filed a Complaint against Phillip L. Clark, Administrator of the Estate of Shick. Thereafter, the Leights filed an Amended Complaint, adding UPP, UPMC, Pitt, and Susan as defendants. After the filing of Preliminary Objections by UPP, UPMC, Pitt, the Leights filed a Second Amended Complaint. In the Second Amended Complaint, the Leights alleged, inter alia, negligence claims against Pitt and UPP. On October 7, 2013, UPMC, UPP and Pitt filed Preliminary Objections to the Second Amended Complaint, arguing, inter alia, that there was no duty to warn or protect Kathryn from Shick and that there was no duty owed to Kathryn under the MHPA. The Leights filed Preliminary Objections to the Preliminary Objections filed by UPMC, UPP and Pitt, arguing that UPP acted with gross negligence under the MHPA in its treatment decision regarding Shick. The Leights also filed a Third Amended Complaint, adopting most of the Second Amended Complaint, and adding, inter alia, that the physicians who interacted with Shick were agents of UPP, UPMC, and Pitt, and vicarious liability claims against Pitt and UPMC.

On May 27, 2014, following a hearing, the trial court entered an Order sustaining in part and overruling in part the Preliminary Objections filed by

UPP and UPMC.[3] Relevantly, the trial court dismissed the MHPA claims, finding that the MHPA does not apply to voluntary outpatient treatment.[4] The Leights filed a Motion for Clarification/Correction and Certification, seeking to clarify Pitt's omission from the May 27, 2014 Order, and seeking a certification to immediately appeal the May 27, 2014 Order.[5] On April 2, 2015, the trial court amended its May 27, 2014 Order, dismissing all claims, except for the premises liability claims, against Pitt. The trial court also denied the Motion for Certification.

Thereafter, the parties conducted discovery regarding the ownership and control of the security measures at WPIC. On December 15, 2017, the Leights filed a Motion for Leave to Discontinue in Part, seeking to discontinue

_____

[3] In this Order, the trial court dismissed all claims against UPP and all claims, except those related to premises liability, against UPMC. The trial court erroneously excluded Pitt from the Order. Further, in the Order, the trial court granted the Preliminary Objections filed by Susan, and dismissed the Leights' claims regarding Susan's negligent exercise of control over Shick.

[4] We note that while the Second and Third Amended Complaints appear to raise common law negligence claims against UPP and Pitt, the Leights focused their entire argument on whether the MHPA imposes a duty upon UPP and Pitt. See, e.g., Trial Court Opinion, 5/27/14, at 21 (stating that the Leights "are not contending that common law tort law recognizes any cause of action by persons injured as a result of the failure of the physicians to begin the commitment process."); N.T., 12/5/13, at 5 (in response from a question from the court asking whether the liability is based upon statute or some other duty, the Leights' attorney stated that they were proceeding "[s]olely on statute, … the [MHPA].").

[5] In the interim, the trial court approved a joint tortfeasor agreement between all of the deceased and injured parties and Shick's estate and its liability insurer.

the remaining claims in the case to allow an appeal of the dismissal of the MHPA claims. The trial court granted the Motion and dismissed the remaining claims against Pitt and UPMC. The Leights filed a timely Notice of Appeal.

On appeal, the Leights raise the following question for our review:

Where the Complaint alleged that:

a. treating primary care physicians observed and determined that their paranoid schizophrenic psychotic patient was severely mentally disabled, in need of immediate treatment, and an imminent danger to others;

b. the physicians decided their patient must undergo the involuntary emergency examination and treatment process under Section 302 of the [MHPA];

c. the physicians contacted the facility where such examinations and treatment occurred within the County to discover the steps necessary to cause the process to occur;

d. the physicians affirmatively decided to initiate the process in regard to the dangerous patient and communicated their intent to do so to the treatment facility's staff, but then grossly negligently failed or refused to do so; and,

e. the patient soon thereafter engaged in a shooting spree in the lobby of the examination and treatment facility, causing severe injuries to [Kathryn], the facility's receptionist;

did the lower court err as a matter of law by sustaining preliminary objections of the physicians' employers/principals, erroneously deciding that the physicians' decisions to initiate involuntary examination and treatment proceedings, followed by their grossly negligent decisions to fail or refuse to do so, did not constitute participation in decisions that a severely mentally disabled person in need of immediate treatment be examined or treated under Section 7114 of the Act?

Brief for Appellants at 3-5.

> [O]ur standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.
>
> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

Shafer Elec. & Const. v. Mantia, 67 A.3d 8, 10–11 (Pa. Super. 2013) (citation omitted).

We will address the Leights' claims together as they all relate to whether they have a viable cause of action under the MHPA against Pitt and UPP. The Leights contend that the trial court erred in concluding that the physicians who provided voluntary outpatient medical care were not liable under the MHPA as a matter of law. Brief for Appellants at 32, 34-35; see also id. at 38-40 (asserting that the trial court failed to examine the pleadings in a light most favorable to the Leights). The Leights argue that the trial court erred in "finding that the absence of mention of voluntary outpatient treatment in the [MHPA's] scope language [under section 7103] immunized physicians providing voluntary outpatient medical treatment from their grossly negligent involuntary examination decisions." Id. at 33; see also id. (claiming that

there is no ambiguity in section 7114, "which imposes [the] duty and potential liability upon any physician participating in a determination that a person be involuntarily examined for potential commitment."). The Leights argue that the trial court's interpretation of the MHPA is flawed, as a determination that an involuntary commitment examination is necessary is involuntary, not voluntary, treatment. Id. at 35. The Leights assert that the pleadings in this case aver that the physicians were "grossly negligent" in determining that Shick be involuntarily examined for potential commitment and treatment, but failing to follow through to accomplish the evaluation. Id. at 31, 33, 35, 39-41; see also id. at 40 (stating that section 7302 of the MHPA authorizes physicians treating mentally ill persons to be involuntarily examined through four different methods). The Leights argue that physicians may be held liable for the consequences of these actions under section 7114. Id. at 35.

The Leights further claim that the trial court erred in "attempting to graft the [s]ection 7103 scope language onto the [s]ection 7114 language establishing liability for grossly negligent participation in involuntary examination determinations[.]" Id. at 36-37. The Leights argue that under section 7114, physicians are given the same duty of care as peace officers. Id. at 37. The Leights contend that a peace officer's potential liability would only result from "gross negligence" in determining whether a mentally ill person be involuntarily examined. Id. The Leights assert that under the trial court's interpretation of sections 7103 and 7114, a peace officer could never

be liable for such a decision because the officer would not handle a voluntary inpatient or involuntary outpatient or inpatient person. Id. at 37. The Leights thus argue that the physician, like the peace officer, may be held liable under the MHPA for their determination of whether a mentally ill person be involuntarily examined. Id. at 37-38.

Because the issue of whether the Leights may bring an action against Pitt and UPP pursuant to the MHPA is "one of statutory construction—a pure question of law—our standard of review is de novo and our scope of review is plenary." Scungio Borst & Assocs. v. 410 Shurs Lane Developers, LLC, 146 A.3d 232, 238 (Pa. 2016).

> In interpreting a statute, this Court endeavors to ascertain and effectuate the intention of the General Assembly. Because, generally, the best indicator of legislative intent is the plain language of the statute, we begin our inquiry by considering the words of the statute. In doing so, we construe words and phrases according to their common and approved usage or, as appropriate, their peculiar and appropriate or statutorily provided meanings. Finally, we bear in mind that words and phrases must be viewed not in isolation, but with reference to the context in which they appear.

Id. (citations, ellipses, and quotation marks omitted).

"[T]he General Assembly enacted the MHPA to provide procedures and treatment for the mentally ill in this Commonwealth." Martin v. Holy Spirit Hosp., 154 A.3d 359, 362 (Pa. Super. 2017); see also 50 P.S. § 7102 (stating that "[i]t is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be

effected."). "This act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons." 50 P.S. § 7103;[6] see also id. (stating that "[i]npatient treatment" shall include all treatment that requires full or part-time residence in a facility.").

The immunity provision of the MHPA provides as follows:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

Id. § 7114(a); see also Farago v. Sacred Heart Gen. Hosp., 562 A.2d 300, 304 (Pa. 1989) (stating that the clear intent for enacting Section 7114 of the MHPA was "to provide limited protection from civil and criminal liability to mental health personnel and their employers in rendering treatment in this unscientific and inexact field."). Section 7114(a) has been interpreted "to include not only treatment decisions, but also, care and other services that

_____

[6] The General Assembly recently amended various sections of the MHPA, including section 7103, to be effective on April 22, 2019. See MENTALLY ILL PERSONS—TREATMENT, 2018 Pa. Legis. Serv. Act 2018-106 (H.B. 1233). However, the cited language of section 7103 remains the same in the amended version of section 7103.

supplement treatment in order to promote the recovery of the patient from mental illness." Martin, 154 A.3d at 363 (citation and quotation marks omitted). While section 7114(a) provides immunity to parties treating persons under the MHPA, it also provides for an affirmative cause of action upon a showing of gross negligence or willful misconduct. See Goryeb v. Com., Dep't of Pub. Welfare, 575 A.2d 545, 548–49 (Pa. 1990).

Here, a plain reading of the statutes demonstrates that while a plaintiff may maintain a cause of action where the parties treating or examining a patient under the MHPA have acted with gross negligence, the MHPA only applies to all involuntary inpatient or outpatient treatment, and voluntary inpatient treatment of mentally ill persons. See 50 P.S. § 7103; see also McNamara by McNamara v. Schleifer Ambulance Serv., Inc., 556 A.2d 448, 449 (Pa. Super. 1989) (stating that the MHPA "establishes rights and procedures for all involuntary treatment and voluntary inpatient treatment of mentally ill persons.") (emphasis omitted). Thus, the immunity and cause of action provisions under section 7114 of the MHPA do not apply to voluntary outpatient treatment. See McKenna v. Mooney, 565 A.2d 495, 496 (Pa. Super. 1989) (holding that section 7103 clearly states that the MHPA does not apply to voluntary outpatient treatment); see also DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 284 (3d Cir. 2007) (noting that "Pennsylvania courts have held that the MHPA does not apply to voluntary outpatient treatment.").

In the instant case, the Leights do not allege that UPP or Pitt was negligent in its examination or treatment of Shick while he was an involuntary inpatient or outpatient, or a voluntary inpatient at any facility. Further, the Leights do not raise any allegations regarding a decision to discharge Shick to outpatient care. Instead, the Leights attempt to expand the scope of the MHPA by asserting that treatment decisions on a voluntary outpatient basis established a duty on UPP and Pitt to protect Kathryn from Shick. However, because the "physicians never started the process for seeking an emergency examination …, no decision was ever made as to whether Shick should be involuntarily examined and receive involuntary treatment." Trial Court Opinion, 5/27/14, at 23; see also 50 P.S. § 7302(a) (noting that an application for examination may be undertaken upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination."). In point of fact, while Shick was evaluated by WPIC staff, the Leights do not allege that there was treatment or examination under the dictates of the MHPA. While we sympathize with the Leights' argument, this Court cannot conclude that the mere thought or consideration of initiating an involuntary examination during voluntary outpatient treatment falls within the explicit scope of the MHPA. See Fogg v. Paoli Mem'l Hosp., 686 A.2d 1355, 1358 (Pa. Super. 1996)

(noting that while a patient presented himself for treatment at an emergency room, he was not examined or treated by anyone in the field of mental health, and no decision regarding his treatment was made, the hospital could not "avail itself of the immunity protections of [section 7114 of] the MHPA."); see also Herman v. Cty. of York, 482 F. Supp. 2d 554, 567–68 (M.D. Pa. 2007) (concluding that the MHPA was inapplicable where no proceedings for an involuntary examination or treatment were instituted and the patient was not receiving any voluntary inpatient treatment). Thus, the Leights cannot sustain a cause of action under the MHPA, and the trial court properly granted the Preliminary Objections filed by UPP and Pitt.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  12/31/2018