J-A14017-22, J-A14018-22

2023 PA SUPER 38

| STEVEN MATOS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JESSICA L. FREDERICK, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, MD; RICHARD T. DAVIES, JR., PA-C; ALLEY MEDICAL CENTER; DAVID Y. GO, M.D., AND KYLE C. MAZA, PA-C | |
| APPEAL OF: ALLEY MEDICAL CENTER; DAVID Y. GO, M.D.; AND KYLE C. MAZA, PA-C | |
| | No. 1189 MDA 2021 |

Appeal from the Order Entered June 15, 2021
In the Court of Common Pleas of Columbia County
Civil Division at No: 1067-CV-2013

| STEVEN MATOS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JESSICA L. FREDERICK, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, MD; RICHARD T. DAVIES, JR., PA-C; ALLEY MEDICAL CENTER; DAVID Y. GO, M.D., AND KYLE C. MAZA, PA-C | |
| APPEAL OF: GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, MD; AND RICHARD T. DAVIES, JR. PA-C | No. 1190 MDA 2021 |

J-A14017-22, J-A14018-22

Appeal from the Order Entered June 15, 2021
In the Court of Common Pleas of Columbia County
Civil Division at No: 1067-CV-2013

BEFORE: BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.[*]

OPINION BY STABILE, J.:                    **FILED: MARCH 10, 2023**

In these interlocutory appeals by permission, which we consolidate under Pa.R.A.P. 513, Appellants, Geisinger Medical Center, Alley Medical Center, and individuals employed by these entities,[1] seek review of the trial court's refusal to grant them summary judgment in an action brought by Appellee, Stephen Matos, administrator of the estate of Jessica Frederick, deceased, under the Mental Health Procedures Act ("MHPA"), 50 P.S. §§ 7101—7503. The record demonstrates that Westley Wise ("Wise"), who had a record of acute psychiatric issues, submitted himself for voluntary inpatient examination and treatment by presenting himself at Geisinger and then at Alley. Medical personnel at both facilities examined Wise but denied his requests for treatment.[2] Wise murdered his girlfriend, Frederick, the same day that Alley refused treatment. Matos alleges that Geisinger and Alley are

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We will refer to Geisinger and its personnel collectively as "Geisinger" and to Alley and its personnel collectively as "Alley." We will refer to Appellee as "Matos."

[2] We acknowledge that both Geisinger and Alley have at times challenged whether they in fact examined Wise. For purposes of reviewing this denial of summary judgment, we will accept the fact that both examined Wise as pled by Matos, the non-moving party.

- 2 -

liable for gross negligence and/or willful misconduct because they denied Wise's request for treatment. Relying on **Leight v. University of Pittsburgh Physicians**, 243 A.3d 126 (Pa. 2020), a decision that addressed the involuntary examination process under the MHPA, Geisinger and Alley contend they are not liable under the MHPA because no written application was ever made to admit Wise for voluntary inpatient treatment. We disagree. The prerequisites to triggering application of the MHPA are not the same for involuntary examination, the process analyzed in **Leight***,* and voluntary inpatient treatment, the process in this case. While the MHPA requires a written application to begin the involuntary examination process, it does not require a written application to begin voluntary inpatient examination and treatment. Thus, facilities such as Geisinger and Alley may be held liable for refusal to provide voluntary inpatient examination and treatment to a person who submits himself for examination and treatment when the refusal constitutes willful misconduct or gross negligence. Accordingly, we affirm the denial of summary judgment and remand for further proceedings.

The evidence, construed in the light most favorable to Matos, demonstrates that Wise suffered a traumatic brain injury at the age of six when he was thrown from the back of an ATV while riding without a helmet. He was in a coma at Geisinger for days but eventually regained consciousness and then required extensive hospitalization thereafter. The accident left Wise with ongoing cognitive and behavioral issues throughout his childhood and adolescence, including poor judgment and lack of impulse control.

In May 2000, Wise was heavily abusing alcohol and street drugs and had acute psychological problems. He checked himself into Geisinger for psychiatric treatment and was placed into an inpatient treatment center for what he described as a nervous breakdown. He was released after 28 days of treatment.

Between 2005 and 2007, Wise treated with Alley for mental health issues, including bipolar disorder. In 2007, while living with Jennifer Karns, the mother of two of his children, Wise again abused drugs and alcohol and had significant employment issues. During an argument with Jennifer, Wise "blacked out" and "snapped," R.R. 565, and cut Jennifer's throat with a knife. Wise was convicted of simple assault and served 21 months in county jail.

In January 2011, Wise again was using street drugs and was having employment problems and ongoing problems with his live-in girlfriend, Jessica Frederick. In addition, his best friend died in a drunk driving automobile accident. On January 21, 2011, Wise reacted to these events by calling for an ambulance to take him to Geisinger's emergency room. Wise testified that he went to Geisinger because he previously had been admitted there for voluntary psychiatric treatment and was familiar with its admission process. Wise's father received a call that night that Wise was going to the hospital for psychiatric treatment. Wise's father drove from Pottstown to Geisinger to be with Wise.

Wise submitted himself for examination and requested inpatient treatment, stating to Geisinger personnel that he was "suicidal, like I was

going to snap," Wise Deposition at 64, that he felt "suicidal or homicidal," *id.* at 65, and that he "felt like I was going to snap. I didn't feel mentally right at the time." *Id.* Wise recounted his conversation with the psychiatric physician assistant, Appellant Davies, as follows:

Q. What did you tell him?

A. Just told I felt like I was going to snap. I told him I wasn't mentally right, that I wanted to stay there.

Q. You asked him to stay there?

A. Yeah.

Q. Why did you want to stay there?

A. I just wasn't feeling safe, wasn't feeling okay.

Q. And how long were you with this . . . physician[] assistant, Mr. Davies?

A. Maybe 15, 20 minutes.

Q. Did you ask him if you could stay at the hospital?

A. Yeah.

Q. What did he say?

A. He said no.

Q. Did he explain to you why?

A. Basically he was saying I wasn't bad enough to stay there, more or less.

*Id.* at 69.

Geisinger discharged Wise without admitting him as an inpatient and without administering any treatment. According to Geisinger's medical records, the plan for Wise merely advised him to stop alcohol and street drugs, take daily vitamins, contact the area Service Unit for psychiatrist supervision and call Tapline if he was suicidal or homicidal or felt worse.

Wise's father, Barry, informed Geisinger that Wise stated he feared he would harm himself or another person:

Q. Okay. What did you observe during this interaction?

A. Well, . . . he introduced himself. And I don't know what his name was . . . I don't know.

Q. Okay.

A. [] I asked him, . . . what was going on. And I said, I know he . . . when I come there, too, I had asked Wes, too. And he said, I need to stay here. I need to stay here, you know. And I asked him, I said . . . he wants to be committed and stuff. And he says, well, he's not bad enough. And I says, what do you mean, not bad enough? . . . I said, if a person . . . calls 911 and come here because . . . they are afraid of doing something or hurting themselves or somebody, I mean - - and they said, well, you know, we don't feel he's bad enough....

Barry Wise Deposition at 86.

On January 24, 2011, three days after his discharge from Geisinger, Wise, accompanied by his father, presented for examination and inpatient treatment at Alley. Wise's father told physician assistant Maza that Wise needed help because he feared hurting himself or someone else, "And you know, I said, you know, I think he needs to be put somewhere so . . . he needs help. Some help." *Id.* at 110. Wise's father elaborated:

- 6 -

> Q. Okay. Did you tell ... Mr. Maza ... that you believed that Wes was either a danger to himself or someone else?
>
> A. I said - - this is what I remember saying when we sat there: You know, I told him about the Geisinger thing. You know, he called to get help, you know, because he felt he was going to hurt himself or somebody....

*Id.* at 113. Wise testified that he told Maza he had been having hallucinations and delusions, that he was suicidal or homicidal, and that he felt as if he were going to snap. Wise Deposition at 81-83. Nevertheless, Alley discharged Wise without further treatment.

Wise returned home to his apartment, where his girlfriend, Jessica Frederick, asked him to stay the night because he was planning to go to his father's residence for the foreseeable future. Wise killed Frederick that night and attempted unsuccessfully to kill himself. Wise later pled guilty to third-degree murder and is now serving a sentence of imprisonment.

Matos, the administrator of Frederick's estate, commenced this action alleging that Geisinger and Alley are liable under the MHPA for gross negligence and/or willful misconduct in failing to diagnose Wise's condition and failing to initiate inpatient treatment. In mid-2017, Geisinger and Alley each filed motions for summary judgment, claiming, *inter alia*, that they did not owe any duty of care to Frederick under the MHPA. In late 2017, the trial court denied these motions, and in early 2018, the court denied Geisinger's and Alley's motions for reconsideration.

In April 2019, Geisinger and Alley each filed their second motions for summary judgment, citing the Superior Court's decision in **Leight**[3] that medical providers were not liable under the MHPA for refusing to initiate involuntary commitment procedures against a patient who subsequently killed one person and injured several others in a shooting spree. One month later, the trial court denied Geisinger's and Alley's motions.

On June 1, 2021, Geisinger and Alley each filed their third motions for summary judgment based on our Supreme Court's decision in **Leight** affirming this Court's decision that the medical providers were not liable under the MHPA. On June 15, 2021, the trial court denied Geisinger's and Alley's motions but granted them permission to take an immediate interlocutory appeal to this Court. Geisinger and Alley filed timely petitions for permission to appeal, and this Court granted both petitions.

Alley raises one issue in its appeal:

> Whether [Matos] has a viable cause of action under section 7114 of the Mental Health Procedures Act, when in [**Leight**], the Supreme Court expressly limited liability under the Act to decisions made after treatment had been formally initiated under the act, which circumstances did not occur in the instant matter?

Alley's Brief at 9.

Geisinger raises two issues in its appeal:

> (1) Whether the precedents established by the Supreme Court of Pennsylvania in **Goryeb v. Commonwealth Dept. of Public Welfare**, 575 A.2d 545 (Pa. 1990) and [**Leight**], which arise in

---

[3] 202 A.3d 103 (Pa. Super. 2018).

- 8 -

the context of involuntary examination and treatment under Article III of the MHPA, apply with equal force to voluntary examination and treatment under Article II of the Act?

(2) Whether the Supreme Court of Pennsylvania's precedent in *Leight*—which declined to extend a statutory duty to control a patient for the protection of a third party absent formalization of the statutory prerequisites necessary to initiate an examination under the Act—mandates dismissal of this action when the uncontroverted record establishes that the patient was never treated under the dictates of the MHPA?

Geisinger's Brief at 3-4.

Our standard of review of an order granting or denying summary judgment is well-settled:

We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Daley v. A.W. Chesterton, Inc.*, 37 A.3d 1175, 1179 (Pa. 2012).

Geisinger's and Alley's arguments boil down to a few simple points in support of their argument that they are immune from liability under Section 114(a) of the MHPA, 50 P.S. § 7114(a). Geisinger argues that under *Leight* the prerequisites for voluntary inpatient treatment were not met to trigger the MHPA, since Wise never filled out an application to commence the process for voluntary inpatient treatment. Geisinger Brief at pgs. 9-10. Similarly, Alley argues that the MHPA's plain language does not apply to a physician's

decision-making regarding whether to commit an individual for voluntary inpatient treatment, and that under *Leight,* the MHPA does not apply where commitment is considered but not formalized with a written certification or application by a physician, among other requirements. Alley Brief at pgs. 10-11.

Section 7114(a) provides:

> (a) **In the absence of willful misconduct or gross negligence**, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, **or a county administrator or other authorized person who denies an application for voluntary treatment** or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114. (Emphasis added). "Section 7114 has been characterized as an immunity provision, as well as providing for a statutory cause of action, albeit by implication." *Leight*, 243 A.3d at 140.

The issue whether Geisinger and Alley are immune under Section 7114 raises a question of statutory interpretation. *Id.* at 139. Our overriding object in interpreting a statute is "to ascertain and effectuate the intention of the General Assembly" in enacting the statute. 1 Pa.C.S.A. § 1921(a). If statutory language is "clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.*, § 1921(b). When the words of a statute have a plain and unambiguous meaning, it is this

meaning which is the paramount indicator of legislative intent. *Leight*, 242 A.3d at 139.

In *Leight*, our Supreme Court, applying statutory construction principles, addressed whether health care professionals could be liable under Section 7114 for failure to initiate the application process for an *involuntary* emergency examination at a mental health facility. The trial court and all parties in the present case argue that *Leight* supports their respective positions as to whether Geisinger and Alley properly denied *voluntary inpatient treatment* to Wise. Accordingly, we begin with a detailed discussion of *Leight* before performing further statutory analysis of Section 7114.

In *Leight*, the Court considered the viability of an action under the MHPA against medical providers who considered, but did not initiate, an *involuntary* emergency examination under Section 302 of the MHPA, 50 P.S. § 7302, against an outpatient named Shick. The plaintiffs alleged that Shick had a six-year history of mental instability and psychiatric care for depression and bipolar disorder. He had been involuntarily committed on several occasions but then released. His outpatient primary care physicians encouraged him to treat with a psychiatrist, but he repeatedly declined medication and treatment and became schizophrenic and noncompliant with his medications. One of his primary care physicians requested paperwork to begin proceedings to determine if he should be involuntarily committed, but the physician failed to complete the process. One week after the doctor failed

to file the paperwork, Shick was sent a letter advising that the practice would no longer provide care to him. Eight days later, Shick went to a psychiatric clinic with two loaded firearms and opened fire, killing one person and injuring several others, including the receptionist. The receptionist and her husband filed a civil complaint against the primary care physicians, asserting that the physicians should have begun an involuntary emergency examination under the MHPA. The trial court sustained the defendants' preliminary objections to the MHPA claim and dismissed it for failure to state a cause of action. This Court affirmed the dismissal of the MHPA claim.

Our Supreme Court accepted the plaintiffs' petition for allowance of appeal and ultimately held that the complaint failed to state a cause of action under the MHPA. The Court began by acknowledging that the General Assembly's purpose for enacting the MHPA in 1976 was to assure the availability of adequate treatment to those who are mentally ill. *Leight,* 243 A.3d at 130 (citing 50 P.S. § 7102). The legislature, through the MHPA, and in conformity with principles of due process, sought to assure the availability of voluntary and involuntary treatment "where the need is great and its absence could result in serious harm to the mentally ill person or to others." *Id*. The plain language of Section 103 of the MHPA, 50 P.S. § 7103,[4] makes

---

[4] 50 P.S. § 7103 provides, "This act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons."

clear that the MHPA does not extend to voluntary outpatients; it applies "only to inpatients and involuntary outpatients." **Leight**, 243 A.3d at 139. Because there was no suggestion that the physicians treated Shick on anything but a voluntary outpatient basis, the Court concluded that the physicians' treatment actions fell outside the coverage of the MHPA.

The plaintiffs argued that the physicians participated in a treatment decision, and therefore were liable under the MHPA, because they began (but did not complete) the statutory process for involuntary commitment. The Court rejected this argument based on its construction of Sections 7114 and 7302. Section 7114, the Court observed, immunizes individuals from liability who, *inter alia*, "participate[] in a decision that a person be examined or treated under [the MHPA]," except in instances of willful misconduct or gross negligence. Under Section 302, a person can be subjected to an *involuntary* emergency examination only if one of three mandatory prerequisites is met: (1) certification of a physician; (2) warrant issued by the county administrator authorizing such examination; or (3) application by a physician or other authorized person who has personally observed actions indicating a need for an emergency application. Reading Sections 7114 and 7302 together, the Court concluded that the providers did not "participate" in a decision that Shick be examined, and therefore were immune from liability, because none of the three preconditions under Section 302 were met:

> '[P]articipat[ing] in a decision that a person be examined' under the MHPA is achieved for purposes of Section [7114] *only* **after**

- 13 -

**one of the prerequisites set forth in Section [7302] for an involuntary emergency examination is satisfied**. The requirements of Section [7302] are exclusive, clear, and unequivocal. Physicians who never invoke a necessary requirement for involuntary emergency examination are not, for purposes of Section [7114], participating in a decision that a person be examined. It is only when a physician files the required documentation for involuntary emergency examination that he becomes a participant in the decision-making process under the Act.

In addition to the manifest requirements of Section [7302], this conclusion is supported by the later phrase in Section [7114] which grants immunity to those "who den[y] an application for voluntary treatment or for involuntary emergency examination and treatment." 50 P.S. § 7114. Clearly, an application cannot be denied until it is first formally made.

Actions by a physician in an outpatient setting that fall short of satisfying these mandatory requirements do not transform voluntary outpatient treatment into involuntary treatment.

*Id.* at 141 (emphasis added). The Court concluded:

Applying our interpretation of the MHPA's provisions to the instant case, we find that Appellees' physicians never satisfied the prerequisites for the involuntary emergency examination process under Section [7302] for Shick. That being the case, the physicians did not take part in a decision that Shick be examined or treated under Section [7114], and, therefore, they were not engaged in an involuntary commitment decision. We reiterate that mere thoughts, consideration, or steps short of the mandated Section [7302] prerequisites for initiating an involuntary emergency examination lie outside of a Section [7114] cause of action. As Appellees and their physicians never participated in a 'decision that a person be examined or treated under the [MHPA],' we are compelled to conclude that Section [7114] is inapplicable and Appellants' cause of action was rightfully dismissed.

*Id.* at 143.

Central to *Leight's* conclusion that the physicians were immune from

liability under Section 7114 was its determination that the physicians did not

- 14 -

satisfy any prerequisite for an involuntary examination. Geisinger and Alley argue that there is no reason why **Leight's** logic should not apply here with equal force to cases concerning voluntary inpatient treatment. As stated, they claim no prerequisite for voluntary inpatient treatment occurred because there was no written application to provide voluntary inpatient treatment to Wise. We agree that **Leight's** logic applies with equal force to this case, but we reach a different result because the prerequisites for involuntary examination are not the same as those for voluntary inpatient examination and treatment. We arrive at this determination by comparing the relevant statutes in the MHPA relating to its inpatient voluntary and involuntary provisions.

| VOLUNTARY INPATIENTS | INVOLUNTARY INPATIENTS |
|---|---|
| **50 P.S. § 7201. Persons who may authorize voluntary treatment** | **50 P.S. § 7301. Persons who may be subject to involuntary emergency examination and treatment** |
| **Any person 14 years of age or over who believes that he is in need of treatment** and substantially understands the nature of voluntary treatment **may submit himself to examination and treatment** under this act, provided that the decision to do so is made voluntarily. A parent, guardian, or person standing in loco parentis to a child less than 14 years of age may subject such child to examination and treatment under this act, and in so doing shall be deemed to be acting for the child. Except as otherwise authorized in this act, all of the provisions of this act governing | *(a) Persons Subject.*--Whenever a person is severely mentally disabled and in need of immediate treatment, **he may be made subject to involuntary emergency examination and treatment**. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself, as defined in subsection (b), or the person is determined to be in need of |

| | |
|---|---|
| examination and treatment shall apply. | assisted outpatient treatment as defined in subsection (c). |
| **50 P.S. § 7202. To whom application may be made**<br><br>**Application for voluntary examination and treatment shall be made to an approved facility** or to the county administrator, Veterans Administration or other agency of the United States operating a facility for the care and treatment of mental illness. When application is made to the county administrator, he shall designate the approved facility for examination and for such treatment as may be appropriate.<br><br>**50 P.S. § 7203. Explanation and consent.**<br><br>**Before a person is accepted for voluntary inpatient treatment, an explanation shall be made to him of such treatment, including the types of treatment in which he may be involved, and any restraints or restrictions to which he may be subject, together with a statement of his rights under this act. Consent shall be given in writing upon a form adopted by the department.** The consent shall include the following representations: That the person understands his treatment will involve inpatient status; that he is willing to be admitted to a designated facility for the purpose of such examination and treatment; and that he consents to such admission | **50 P.S. § 7302. Involuntary emergency examination and treatment authorized by a physician--Not to exceed 120 hours**<br><br>*(a) Application for Examination.--* Emergency examination may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.<br><br>*1) Warrant for Emergency Examination.--* **Upon written application by a physician or other responsible party** setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant.<br><br>*(2) Emergency Examination Without a Warrant.--* Upon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, an[y] |

| | |
|---|---|
| voluntarily, without coercion or duress; and, if applicable, that he has voluntarily agreed to remain in treatment for a specified period of no longer than 72 hours after having given written notice of his intent to withdraw from treatment. The consent shall be part of the person's record. | physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. **Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.** |

[Emphasis added].

As can be seen, whereas a written application is a prerequisite to initiating the involuntary inpatient examination process, no such prerequisite exists to commence voluntary inpatient examination and treatment.

An involuntary inpatient examination is not the patient's own choice; he "is made subject to" examination, 50 P.S. § 7301, when a third person such as a physician requests examination and treatment, 50 P.S. § 7302. The applicant is a third person such as a physician, peace officer or other responsible party. *See* 50 P.S. § 7302(1) (physician or other responsible party must file a "written application" for emergency examination); 50 P.S. § 7302(2) (physician, peace officer or person authorized by the county administrator must file a "written statement" articulating the grounds for an emergency examination). Under the involuntary inpatient examination provisions medical providers are deemed immune from liability until "written" application is filed requesting an involuntary emergency inpatient examination, as a written application is the prerequisite to initiating this process. *Leight*, 243 A.3d at 141. Only after a written application is made

- 17 -

may a medical provider be liable for denying an involuntary inpatient examination if denial constitutes willful misconduct or gross negligence. *Id.*

In contrast, in the case of voluntary inpatient examination and treatment under Section 201, 50 P.S. § 7201, entitled "[p]ersons who may authorize voluntary treatment", a person may submit himself for voluntary inpatient examination and treatment. A person typically does so by taking himself to an emergency room for an evaluation to determine the level of treatment needed. There are no hearings required for admission. Voluntary admission to a facility may occur after the person is examined and the evaluating provider and person agree that he would benefit from hospitalization. If the person is to be admitted, he is then required to sign a consent form that documents his rights and describes the proposed inpatient treatment plan. In short, the prerequisite for triggering voluntary inpatient examination and treatment is when a person "submit[s] himself" to a facility requesting examination for inpatient treatment.[5] Thus, while we apply *Leight's* rationale that a prerequisite to treatment under the MHPA first be satisfied before liability may be asserted against a provider under the MHPA, the prerequisites are different for involuntary inpatient examination and voluntary inpatient examination and treatment. The only prerequisite

_____

[5] We acknowledge that under Section 202, 50 P.S. § 7202, a person also may apply to a county administrator or approved agency for voluntary examination and treatment, a process not relevant to the facts of this case because Wise presented himself to the Geisinger and Alley facilities seeking voluntary inpatient examination and treatment.

necessary to trigger the MHPA's process for voluntary inpatient examination and treatment is a person submitting himself to an approved facility requesting examination and admission for inpatient treatment. Nowhere does the MHPA require that a written application first be made before the person submits himself to a facility for examination and treatment. While the involuntary inpatient examination provisions require a "written" application for examination and treatment, the term "written" is conspicuously absent from the MHPA's voluntary inpatient examination and treatment provisions. The inclusion of "written" in the involuntary inpatient examination provisions and its omission from the voluntary inpatient examination and treatment provisions demonstrates that the legislature did not intend to require written applications for voluntary inpatient examination and treatment. **See Fonner v. Shandon, Inc.**, 724 A.2d 903, 907 (Pa. 1999) (where "unless" language was in one section of Workers' Compensation Act but not in second section, legislature had different intent in drafting second section; "where a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent"). Because of this difference, the point at which liability may attach under the MHPA differs as between the involuntary examination and voluntary inpatient examination and treatment processes. If a facility refuses to examine a person who presents himself for voluntary inpatient examination and treatment, or after examination refuses to admit the person for treatment,

liability may attach if the refusal constitutes willful misconduct or gross negligence.

The record here reflects that Wise, an individual with a history of acute psychological problems and a criminal record for assault, visited Geisinger and verbally requested inpatient treatment, claiming that he was homicidal and suicidal and about to snap. Geisinger's medical providers performed an initial evaluation examination on Wise but declined his request for inpatient treatment. Three days later, Wise visited Alley and verbally requested inpatient treatment upon the same bases. Alley's medical providers performed an examination but declined Wise's request for inpatient treatment. That night, Wise murdered Frederick.

Construed in the light most favorable to Matos, the trial court properly denied summary judgment to Geisinger and Alley on the narrow question that was before the court. A prerequisite for liability under the voluntary inpatient examination and treatment provisions of the MHPA was satisfied when Wise submitted himself to approved facilities, Geisinger and Alley, for voluntary inpatient examination and treatment. Geisinger and Alley examined Wise but denied inpatient treatment. Under Section 7114, Geisinger and Alley participated in decisions concerning whether to treat Wise for voluntary inpatient treatment. Therefore, they may be subject to liability if their conduct constituted willful misconduct or gross negligence.

In an attempt to buttress their argument that the voluntary inpatient examination and treatment provisions of the MHPA are not triggered until a

written application is submitted, Geisinger and Alley cite a DHS regulation, 55 Pa. Code § 5100.72, which prescribes that "[w]ritten application for voluntary inpatient treatment shall be made upon Form MH-781, issued by the Department." *Id.* Reference to completing such a form is found under Section 203 of the MHPA, 50 P.S. § 7203. Geisinger and Alley argue that "shall be made" required Wise to complete a written application, and since Wise did not do so, he never became a candidate for voluntary admission, thus shielding Geisinger and Alley from liability. Appellants either read too much into this provision or simply misread its purpose. Form 781, entitled "Consent for Voluntary Inpatient Treatment", instructs a patient that before signing the form, his treatment plan should be explained to him and he should be given a copy of the Patient's Bill of Rights. This is consistent with Section 7203. The form then provides for the patient to execute a voluntary consent to inpatient treatment, acknowledging that (1) he consents to the treatment that has been explained to him, including applicable medications, examination procedures, and restrictions, and (2) before discharge, he must give certain advance notice in writing to those in charge of his treatment. Clearly, the regulation and its accompanying form concern a different step in the voluntary inpatient examination and treatment process than what is at issue in this case. The regulation and form require the patient's written, informed consent to treatment **after** a medical provider examines him and determines that inpatient treatment is necessary—a step that never took place in this case because Geisinger and Alley refused to treat Wise.

- 21 -

Geisinger and Alley urge that this case will open the floodgates for lawsuits against medical providers unless we find them immune from suit under the MHPA. Our job, however, is to apply the law as written. It is up to our legislature to decide policy issues as to when and under what circumstances medical providers may be liable for harm. Here, the legislature has drawn that line only to impose liability if the refusal to treat a person constitutes willful misconduct or gross negligence. This demanding standard reflects the legislature's attempt to strike a balance between the rights of patients and the ability of medical providers to provide adequate mental health services. We find our conclusion also to be consistent with the legislature's intent to assure the availability of adequate treatment to those who are mentally ill and where the need is great and its absence could result in serious harm to the mentally ill person or to others. *Leight,* 243 A.3d at 130 (citing 50 P.S. § 7102).

Based on our careful review of the law, we conclude that the trial court properly denied summary judgment to Geisinger and Alley on their claims of immunity under the MHPA. Accordingly, we affirm the order denying summary judgment and remand this case to the trial court for further proceedings.[6]

_____

[6] In reaching our conclusion, we emphasize that we have decided only the narrow question whether facilities like Geisinger and Alley may be liable for willful misconduct or gross negligence under the MHPA for failing to admit a person who submits himself to a facility without a written application for voluntary inpatient examination and treatment. We offer no opinion as to whether the evidence in this case thus far can sustain Matos' action against

*(Footnote Continued Next Page)*

Order affirmed. Case remanded to the trial court for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/10/2023

---

Geisinger and Alley where the deceased was the victim of Wise, who was refused voluntary inpatient treatment. **See Leight**, 243 A.3d at 144-50 (Justice Wecht, concurring) (as to whether mental health professionals have a duty to protect third parties from harm caused by their patients).