**[J-38A-B-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| STEVEN MATOS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JESSICA L. FREDERICK, DECEASED | : | No. 93 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court at No. 1189 MDA |
| | : | 2021 entered on March 10, 2023, |
| v. | : | Affirming and Remanding the Order |
| | : | of the Columbia County Court of |
| | : | Common Pleas, Civil Division, at |
| | : | No. 1067-CV-2013 entered on June |
| GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, M.D.; RICHARD T. DAVIES, JR., PA-C; ALLEY MEDICAL CENTER; DAVID Y. GO, M.D. AND KYLE C. MAZA, PA-C | : | 15, 2021. |
| | : | |
| | : | ARGUED:  May 14, 2024 |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  ALLEY MEDICAL CENTER, DAVID Y. GO, M.D., AND KYLE C. MAZA, PA-C | : | |
| | : | |
| | : | |
| STEVEN MATOS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JESSICA L. FREDERICK, DECEASED | : | No. 94 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court at No. 1190 MDA |
| | : | 2021, entered on March 10, 2023, |
| v. | : | Affirming and Remanding the Order |
| | : | of the Columbia County Court of |
| | : | Common Pleas, Civil Division, at |
| GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, M.D.; RICHARD T. DAVIES, JR., PA-C; ALLEY MEDICAL CENTER; DAVID Y. GO, M.D. AND KYLE C. MAZA, PA-C | : | No. 1067-CV-2013 entered on June |
| | : | 15, 2021. |
| | : | |
| | : | ARGUED:  May 14, 2024 |
| | : | |
| | : | |
| APPEAL OF:  GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, M.D.; AND RICHARD T. DAVIES, JR., PA-C | : | |

## OPINION

**CHIEF JUSTICE TODD**                                    **DECIDED:  April 25, 2025**

In this consolidated appeal, our Court is asked to decide whether our decision in *Leight v. UPMC*, 243 A.3d 126 (Pa. 2020) ("*Leight II*"), bars a suit by a third party under Pennsylvania's Mental Health Procedures Act ("MHPA")[1] for alleged willful misconduct or gross negligence by treatment facilities[2] and their medical staff in failing to admit an individual who presented himself and verbally requested voluntary inpatient treatment for a serious mental health crisis he was experiencing.  After careful review, we conclude that *Leight II* does not bar such a suit, and that the MHPA does not require a person seeking voluntary inpatient treatment to make a written request for such treatment in order to trigger a duty on the part of treatment facilities to engage in the evaluation and treatment processes mandated by the MHPA.  Consequently, we affirm the order of the Superior Court which reached the same conclusion.

### I.  Background

Because this case comes to our Court on appeal from summary judgment proceedings in the trial court — the Columbia County Court of Common Pleas — we are obliged to view the underlying facts in a light most favorable to the non-moving party, Appellee Steven Matos, who is the administrator ("Administrator") of the estate of Jessica Frederick ("Jessica"), and the plaintiff in consolidated lawsuits against Appellants Geisinger Medical Center, Alley Medical Center, and medical personnel in their employ.[3]

---

[1]  50 P.S. §§ 7101-7503.

[2]   A facility is defined by the MHPA as a "mental health establishment, hospital, clinic, institution, center, day care center, base service unit, community mental health center, or part thereof, that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as outpatients or inpatients."  *Id.* § 7103.1.

[3]   *See Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 372 (Pa. 2016) ("[C]ourts review the facts at summary judgment stage in a light most favorable to the nonmoving party.").

So viewed, the following facts were adduced during the summary judgment proceedings below. In January 2011, Westley Wise was experiencing a profound mental health crisis which would lead to tragic consequences — the death of Jessica, who shared an apartment with Wise.

The roots of this crisis originated in Wise's early childhood, when, in 1984, at the age of 6, he suffered a traumatic brain injury in an ATV accident, which left him comatose and hospitalized for an extended period of time. *Matos v. Geisinger Medical Center,* 291 A.3d 899, 901 (Pa. Super. 2023). In the aftermath of that injury, he had numerous cognitive and behavioral issues throughout the remainder of his childhood and during his adolescence, including difficulties with impulse control. *Id.*

By the time he reached adulthood, Wise was heavily abusing illicit street drugs and alcohol to the point that, in 2000, he suffered what he characterized as a nervous breakdown, which prompted him to voluntarily admit himself to Geisinger Medical Center ("Geisinger"), located in the town of Danville, Pennsylvania, where he was placed into an inpatient drug and alcohol treatment program for 28 days. *Id.* at 901-02. Following his discharge from that program, Wise sought further outpatient psychiatric treatment at Alley Medical Center ("Alley") in Berwick, Pennsylvania, where physicians diagnosed him as suffering from bipolar disorder, as well as other attendant mental health afflictions, and treated him with prescription medication. *Id.* at 902.

Subsequently, Wise continued to struggle with mental health difficulties. In 2007, while in the throes of a grave mental health crisis, he "blacked out" and "snapped," and stabbed his then live-in girlfriend and mother of his two children, Jennifer Karns. *Id.* Wise was arrested, and pled guilty to a charge of simple assault, for which he served a 21-month sentence in the Columbia County Jail. *Id.*

Although his life temporarily stabilized after his release from jail, by mid-January 2011, Wise's mental health once more began a precipitous decline due to a combination of his best friend's death in an automobile accident, personal financial difficulties, and a resumption of drug and alcohol use. *Id.* Wise became highly disturbed by his deteriorating mental condition, which involved hallucinations and delusions. He also recalled that he was overcome with such constant and overwhelming anxiety that he felt like he was "going to snap." Deposition of Westley Wise, 5/19/16, at 60-61 (R.R. at 541a-542a).[4] Wise's concern over these feelings, which he remembered as growing in force and intensity to the point that he became suicidal, prompted him to call an ambulance at 9 a.m. on the morning of Friday, January 21, 2011, to be transported to Geisinger. *Id.* at 60 (R.R. at 541a). Wise stated that he specifically wanted to go to Geisinger because he was familiar with its admissions process, having been previously treated there during his voluntary admission over a decade earlier. *Id.* at 66-67 (R.R. at 547a-548a). Wise also called his father, who lived in Pottsville, Pennsylvania, and informed him of his decision, and his father told him that he and his uncle would drive to the hospital to be with him. *Id.* at 62-63 (R.R. at 543a-544a).

Wise was transported by ambulance to Geisinger and placed in a special "panic room" in their Emergency Department, which was reserved for patients experiencing mental health crises. *Id.* His father and uncle met him there an hour after he arrived. *Id.*

While in Geisinger's Emergency Department, Wise was first examined by Dr. Jennifer Savino, whom Wise informed that he was "suicidal" and that he "felt like [he] was going to snap." *Id.* at 65 (R.R. at 546a). Wise also related to her that he was previously treated at Geisinger and was diagnosed as having bipolar disorder. *Id.* at 65 (R.R. at 546a). Wise asked Dr. Savino if he could stay in the hospital, given his feeling that he

---

[4] R.R. refers to the reproduced record filed with our Court in this appeal.

would snap, and expressed his belief that he needed to be admitted to its psychiatric ward and medicated just as he had been previously. *Id.* at 66 (R.R. at 547a).

After that examination concluded, Wise was next seen by a psychiatric physician's assistant, Richard Davies. During their 15-20 minute interaction, Wise informed Davies that he "was going to snap . . . wasn't mentally right, that [he] wanted to stay there." *Id.* at 69 (R.R. at 550a). Davies' notes of his interview indicated that Wise informed him that he had been convicted of simple assault "years ago" and spent 21 months in the county jail. Trial Court Opinion, 12/12/17 at 2 (quoting "Geisinger Medical Records", Exhibit B to Geisinger Motion for Summary Judgment, at Bates # GEI-0406 (R.R. at 92a)). Wise further conveyed that he felt like he needed to stay in the hospital because he "wasn't feeling safe," and "wasn't feeling okay." Deposition of Westley Wise, 5/19/16, at 69 (R.R. at 550a). Wise recalled that Davies refused his request, stating that he "wasn't bad enough to stay." *Id.*

Wise's father, who was present during this examination, confirmed his son's account and added that he had informed Geisinger medical personnel of his son's troubled background and his own fear that Wise would harm himself or someone else because of his present condition. Deposition of Barry Wise, 11/9/16, at 86-90 (R.R. at 270a-274a). Nevertheless, Wise was discharged by Geisinger without any further examination by a psychiatrist and without receiving any treatment. His discharge "plan" instructed that he "stop alcohol and street drugs, take daily vitamins, contact the area Service Unit for psychiatrist supervision and to call Tapline[5] if he was suicidal or homicidal or felt worse." *Matos*, 291 A.3d at 902.

After his discharge, Wise returned with his father to Pottstown to stay at his home for the upcoming weekend. Wise's father related that, during that stay, his son was

---

[5] Tapline is a 24-hour-a-day crisis hotline for residents of Columbia, Montour, Schuylkill and Union Counties. *See* https://www.cmsu.org/crisis-emergency.

experiencing intense agitation and suffering hallucinations. Deposition of Barry Wise, 11/9/16 at 104-105 (R.R. at 288a-289a). This prompted Wise's father and other family members to watch him carefully to prevent him from harming himself. *Id.*

Because of concern over his son's condition, the following Monday, January 24, 2011, Wise's father took him to Alley Medical Center, where Wise's family doctor was on staff. There, he was examined by a physician's assistant, Kyle Maza. Wise's father informed Maza that he believed his son "needed help because he feared hurting himself or someone else." *Matos*, 291 A.3d at 903. During Maza's examination of Wise, Wise told Maza that he was experiencing delusions and hallucinations, and stated, again, that he felt like he was "going to snap." *Id.* At the conclusion of the 15 to 20 minute interview with Maza, Wise was discharged by Alley with a refill for his prescription medication, but no efforts were made by its medical personnel to arrange or secure any further mental health treatment for him. *Id.*

Wise, accompanied by his father, returned to his apartment, which he shared with Jessica and their daughter, intending to retrieve some belongings so he could return to his father's house, as he planned to stay with him for the immediate future. *Id.* However, Wise elected to remain in the apartment overnight at Jessica's request. Tragically, later that evening, Wise stabbed Jessica to death and then attempted to end his own life by taking an overdose of prescription medication. Although Wise survived the suicide attempt, he was arrested and ultimately pled guilty to third-degree murder, for which he was sentenced to a term of 15 to 32 years incarceration.

Subsequently, on August 15, 2013, Administrator filed this action under Section 114(a)[6] of the MHPA[7] against Geisinger, Alley, and the aforementioned medical personnel in their employ who were involved in the diagnosis and treatment of Wise, all Appellants herein. In his complaint, Administrator alleged that they engaged in gross negligence and/or willful misconduct in denying Wise's requests for inpatient treatment.

After the conclusion of discovery, Appellants filed a joint motion for summary judgment asserting, *inter alia*, that they owed no duty to the decedent, Jessica. The trial court rejected this claim based on our decision in *Goryeb v. DPW*, 575 A.2d 545 (Pa. 1990). In that case, an individual, Jeffrey Geiger, was involuntarily committed to a state mental hospital under Section 302(a) of the MHPA[8] by a police officer because he was carrying a hunting knife and threatening to harm himself, and he had previously threatened suicide by firearm a week earlier. Geiger was subsequently discharged within

---

[6] The various statutory sections of the MHPA as set forth in Purdon's Pennsylvania Statutes, the unofficial codification of Pennsylvania law, are most often described in our decisions by the section numbers used in the original act passed by the General Assembly in 1976. *See* Act of July 9, 1976, P.L. 817, No. 143, § 114, amended Act of Nov. 26, 1978, P.L. 1362, No. 324, § 1. Thus, for sake of consistency, we will use those section designations from the original act.

[7] Section 114(a) provides:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114(a). As discussed at greater length herein, Section 114(a) permits a limited cause of action against institutions and individuals that provide treatment to mentally ill patients for acts of willful misconduct or gross negligence.

[8] *Id.* § 7302(a).

the maximum 120-hour period of detainment for treatment allowed by Section 302(a), without hospital personnel making any effort to extend his commitment as permitted under Section 302(d) of the MHPA.[9] After his release, Geiger entered the apartment of his ex-girlfriend and shot her and two other individuals — one of whom died.

The estate of the deceased filed suit under Section 114(a) against the hospital and its medical staff, as well as the Commonwealth, which owned and operated the hospital, asserting they were grossly negligent in discharging Geiger without providing him any treatment. After concluding that the Commonwealth was not immune from such suits under the Sovereign Immunity Act, our Court also held that, under Section 114(a), "a Commonwealth party participating in a decision to examine, treat or discharge a mentally ill patient within the purview of the Mental Health Procedures Act who commits willful misconduct or gross negligence can be liable for such decision." *Goryeb*, 575 A.2d at 549. Further, our Court held that Section 114(a) renders a participant in such a decision who commits willful misconduct or gross negligence liable for the decision and "any of its consequences," which our Court held to mean any injury to the persons or property which could "foreseeably be affected" by the decision. *Id.*

The trial court in the instant matter rejected Appellants' argument that *Goryeb* was inapplicable because Wise had not been admitted to the hospital as was the patient in *Goryeb*. The court found that substantial evidence existed that Wise "repeatedly told all of the [Appellants] that he was 'going to snap,' that he wanted, and even requested, to be admitted to a psychiatric floor, and that he told all of the [Appellants] that he was suicidal or homicidal." Trial Court Opinion, 12/12/17, at 10-11. Further, the court noted that Wise had informed the medical personnel at Geisinger of his past history of violent crime, as

---

[9] Section 302(d), 50 P.S. § 7302(d), requires discharge of a person involuntarily committed under Section 302(a) within 120 hours unless a certification for extended involuntary treatment is filed with the court of common pleas pursuant to Section 303(a), which can extend the commitment for as long as 20 days.

noted in their medical records, which culminated in him serving a 21-month prison sentence for simple assault. All of this evidence, in the trial court's view, could lead a jury to find that Wise was a clear and present danger to himself or others, and, thus, should have been voluntarily committed.

As a result, the trial court concluded that a jury could reasonably find that Appellants were grossly negligent for releasing Wise with "absolutely no treatment," and that their failure to exercise the remedies afforded by the MHPA negated any claim that the catastrophic violence which resulted from this decision was unforeseeable. *Id.* at 11. Further, the court reasoned that, under *Goryeb*, Appellants owed Jessica a duty of care, as she was a foreseeable victim of any violent acts which ensued as the result of their decision not to admit Wise, and that it was ultimately a question for the jury to decide whether Appellants breached that duty.

In April 2019, Appellants filed a second motion for summary judgment based on the decision of the Superior Court in *Leight v. UPMC*, 202 A.3d 103 (Pa. Super. 2018) ("*Leight I*"). By way of background, in that case, Thomas Shick, who had an extensive history of untreated mental illness which resulted in involuntary commitments on five previous occasions while he was living in other states, and ultimately expulsion from a doctoral program, came to Pittsburgh in March 2011, where he again enrolled in a doctoral program at Duquesne University. However, Shick's mental health deteriorated once more, and he began to engage in harassing behaviors that led to his dismissal from the program before the fall semester that year.

As his mental health crumbled during late 2011, Shick repeatedly sought outpatient medical treatment from a variety of medical practitioners for a constellation of alleged physical ailments which the practitioners eventually determined were psychosomatic, and a product of untreated mental illness. Shick was referred to Western Psychiatric Hospital

in Pittsburgh for an outpatient psychiatric evaluation which he voluntarily completed. As a result of that examination, it was determined that he was suffering from schizophrenia, and that this was exacerbated by his failure to take medications which had been previously prescribed for that condition. The evaluating psychiatrist recommended Shick resume taking his medication and enter therapy; however, he did not do so.

Untreated, Shick's behavior became increasingly erratic throughout the remainder of 2011 and into early 2012, which culminated in him appearing at a UPMC physician's office for routine blood testing while brandishing a baseball bat in a threatening manner and alarming the medical staff. Discussions were then actively begun by his UPMC treating physicians as to whether the involuntary commitment procedures of the MHPA should be initiated, but, beyond those discussions, they took no formal action to begin the process. Tragically, in March 2012, Shick, in the throes of a psychotic episode, took two guns he had purchased a year earlier into the lobby of Western Psychiatric Hospital and began randomly shooting individuals in the reception area, killing one person and injuring several others before he was shot by a University of Pittsburgh police officer.

One of the injured individuals, Judith Leight, and her husband filed suit under Section 114(a) against UPMC and the providers involved in Shick's care for their alleged gross negligence in failing to begin the commitment process. The trial court dismissed this claim on preliminary objections, based on its conclusion that, because Shick was being treated on a voluntary outpatient basis, the MHPA did not apply.

The Superior Court affirmed the trial court's dismissal. *Leight I.* The court determined that the MHPA by its plain terms applies only to the type of treatment enumerated in Section 103,[10] which does not include voluntary outpatient treatment. The

---

[10] Section 103 states:

> This act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or

(continued…)

court acknowledged that, while Shick had been voluntarily examined by physicians in the UPMC system for various reasons, there was never any decision made by those physicians as to whether Shick should be subjected to an involuntary examination under Section 302(a) for purposes of determining if he should receive involuntary treatment.[11] The court held that "the mere thought or consideration of initiating an involuntary examination during voluntary outpatient treatment" did not fall within the scope of the MHPA. *Id.* at 117.

In the case at bar, Appellants argued before the trial court that *Leight I* established that the MHPA does not apply to this case because, like the emotionally disturbed

---

> outpatient, and for all voluntary inpatient treatment of mentally ill persons.

*Id.* § 7103.

[11] Section 302(a) provides:

> **(a) Application for Examination.**—Emergency examination may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.
>
> (1) Warrant for Emergency Examination.—Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant.
>
> (2) Emergency Examination Without a Warrant.—Upon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, and physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.

*Id.* § 7302(a).

individual in that case, Wise was never admitted to the hospital for inpatient treatment; rather, he was seen only on an outpatient basis. However, the trial court rejected this argument, noting that this case, unlike *Leight I*, involved a claim for grossly negligent discharge, and, in the trial court's view, such a claim was encompassed by Section 114(a), which assigns liability for gross negligence to a provider who "denies an application for voluntary treatment." Trial Court Opinion, 5/23/19, at 7 (quoting Section 114(a)). Further, the trial court observed that the parties had previously expressly stipulated that the MHPA applies to this matter. Consequently, the trial court denied Appellants' second motion for summary judgment.

After the trial court issued its order denying summary judgment, our Court, which had granted allowance of appeal in *Leight I*, issued our decision affirming the Superior Court. *Leight II*. Before our Court, the Leights argued that, because Section 302 gives physicians and other health care professionals the right to conduct an emergency involuntary examination to determine whether involuntary commitment and treatment is warranted, the examinations themselves constitute involuntary treatment. Thus, the Leights contended that a failure to act regarding a decision to conduct such an involuntary examination was encompassed within Section 103 of the MHPA,[12] and, consequently, was actionable under Section 114(a) if the failure to act constituted gross negligence or willful misconduct.

By contrast, UPMC argued that it had no liability under Section 114(a) because the language of that section imposes liability only for a decision relating to the act of initiating the involuntary treatment process under Section 302, which it contended could be commenced only by the filing of a completed certification by a physician, a warrant

---

[12] *See supra* note 10.

executed by a county administrator,[13] or an application by a physician, peace officer, or other person authorized by the county administrator. UPMC asserted that only after such a document was filed was liability under Section 114(a) triggered.

To resolve these competing arguments, our Court examined what we deemed to be the governing provisions of the MHPA – Sections 103, 114, and 302. We concluded that Section 103, which establishes the coverage of the MHPA, applies only to those individuals who were subjected to involuntary treatment as an inpatient or outpatient, or voluntary treatment as an inpatient. *Leight II*, 243 A.3d at 139. We reasoned that, because the Leights had not alleged that UPMC's physicians were negligent in involuntarily examining or treating Shick on an involuntary inpatient basis, or on a voluntary inpatient basis, and the evidence showed that, to the contrary, Shick was treated only on a voluntary outpatient basis, the treatment actions of the UPMC physicians were outside the coverage of the MHPA.

Turning to Section 114(a), we interpreted that provision as creating a cause of action for willful misconduct or gross negligence "against an individual for . . . participating in a decision that a person be examined or treated under the MHPA." *Id*. at 140. Relatedly, we noted that the criteria for an involuntary examination of someone who is severely mentally disabled[14] are set forth in Section 302, which allows such an involuntary examination only upon "(1) certification of a physician; (2) [a] warrant issued by the county

---

[13] The MHPA defines a county administrator as "the County Mental Health and Mental Retardation Administrator of a county or counties, or his duly authorized delegate." 50 P.S. § 7105.

[14] A person is considered severely mentally disabled

> when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

*Id.* § 7301.

administrator authorizing such examination; or (3) [an] application by a physician or other authorized person who has personally observed actions indicating a need for an emergency application." *Id*. (quoting Section 302(a)). We viewed these three requirements to be "exclusive, clear, and unequivocal," and, thus, concluded that one of them must be met in order for a physician to be deemed to have participated in a decision that a person be involuntarily examined for purposes of Section 114(a). *Id*. at 141. Accordingly, we held that it is "only when a physician files the required documentation for involuntary emergency examination that he becomes a participant in the decision-making process under the [MHPA]," and any other actions which do not fall within these limited categories, such as "the mere thinking, consideration, or the taking of some preliminary action shy of the formal statutory steps necessary for an involuntary emergency examination," do not trigger the application of the limited liability provisions of Section 114(a). *Id*. Therefore, we confirmed the Superior Court's conclusion in *Leight I* that Section 114(a) did not apply to the circumstances of that case, given that none of the physicians involved in Shick's care had ever taken formal action under Section 302(a) to have him subjected to an involuntary examination.

In the case *sub judice*, Appellants filed a third motion for summary judgment in 2021 based on our decision in *Leight II.* The trial court denied this motion as well. In its opinion explaining the basis for its denial, the court first noted that the principal point distinguishing this matter from *Leight II* was that Shick had never sought *voluntary* inpatient treatment as Wise did here; hence, the court regarded *Leight II* as not dispositive of Appellants' motion, given that its holding was limited to situations involving the provision or denial of involuntary treatment. The court further found that the evidence showed:

> [Appellants] were presented with a man who they knew was previously psychiatrically committed; who was expressing homicidal and suicidal ideations; who repeatedly stated that

he was "going to snap"; who had a history of serving 21 months of incarceration for conviction of the violent crime of simple assault; who had no health insurance; and who was begging for voluntary inpatient psychiatric admission and treatment, but who they had turned away with no treatment of any substance.

Trial Court Opinion, 6/15/21, at 7-8. Thus, in the court's view, these facts furnished a basis for a factfinder to conclude that Appellants should have effectuated a voluntary inpatient admission, which *is* an event within the scope of Section 103 of the MHPA. Likewise, the court highlighted that Section 201 of the MHPA[15] also brings this case within the scope of the MHPA, given that it explicitly covers situations such as this one where a person 14 years of age or older voluntarily submits himself to be examined and treated, which Wise did. Moreover, the court pointed out that, unlike in *Leight II*, Administrator raised a claim of negligent discharge to outpatient care — a claim which our Court recognized in *Goryeb* was cognizable under Section 114(a).

Indeed, the trial court opined that, to allow Appellants to escape liability merely by refusing to accept a "volatile and desperate" individual like Wise, would contravene the purpose of the MHPA, which is to "assure . . . adequate treatment to persons who are mentally ill." *Id.* at 7, 8. Lastly, the court once more reminded that Appellants had already

---

[15] Section 201 provides:

> Any person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary treatment may submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily. A parent, guardian, or person standing in loco parentis to a child less than 14 years of age may subject such child to examination and treatment under this act, and in so doing shall be deemed to be acting for the child. Except as otherwise authorized in this act, all of the provisions of this act governing examination and treatment shall apply.

*Id.* § 7201.

stipulated to the applicability of the MHPA, which the court continued to view as a binding admission.

The trial court certified its order denying summary judgment as an immediately appealable interlocutory order under Pa.R.A.P. 312, and Appellants – the Geisinger defendants and the Alley defendants, separately – filed interlocutory appeals from that order to the Superior Court.

The Superior Court, in a published panel decision authored by Judge Victor P. Stabile, affirmed.[16]  *Matos*, 291 A.3d 899.  In its opinion, the court first considered and rejected Appellants' argument that *Leight II* established that, given the treatment facilities in that case were immune because no formal application for involuntary treatment had been made, they were likewise immune from liability because Wise made no written application for voluntary treatment to their facilities.

The court reasoned that, under the MHPA, a written application must be made by a third party as a prerequisite for the *involuntary* treatment process to begin – that is, under Section 302(1), a "written application" must be made by "a physician, peace officer, or other responsible party" for emergency treatment.  Likewise, under Section 302(2), a written statement must be filed by a "physician, peace officer or person authorized by the county administrator" setting forth the grounds for requesting an involuntary examination. *Id*. at 909.  The court determined that such a process, by its nature, cannot be considered voluntary, as the person is "subject to" involuntary commitment by the actions of a third party.

---

[16]  Judge Stabile was joined by President Judge Emeritus John T. Bender, and President Judge Emeritus Correale Stevens.

By contrast, under Section 201, there is no requirement that a third party commence the voluntary treatment process, given that it expressly permits a person to submit himself or herself for voluntary inpatient examination at an approved facility, which is typically an emergency room, where an evaluation is conducted, and, unlike in the involuntary commitment process, no hearings are required to determine if voluntary treatment is warranted. Thus, the court concluded

> [t]he only prerequisite necessary to trigger the MHPA's process for voluntary inpatient examination and treatment is a person submitting himself to an approved facility requesting examination and admission for inpatient treatment. Nowhere does the MHPA require that a written application first be made before the person submits himself to a facility for examination and treatment.

*Id.* at 910. In the court's view, the fact that the legislature chose to omit a requirement for written applications for the commencement of the voluntary inpatient examination and treatment process signified its intent to treat this process differently from that for involuntary commitments, and, correspondingly, the court considered this disparate approach as having altered the point at which liability attaches for a medical provider faced with a request for voluntary inpatient treatment. Accordingly, the court concluded that

> [i]f a facility refuses to examine a person who presents himself for voluntary inpatient examination and treatment, or after examination refuses to admit the person for treatment, liability may attach if the refusal constitutes willful misconduct or gross negligence.

*Id.*

The court additionally rejected Appellants' argument that a person is required to first fill out Form MH-781 from the Pennsylvania Department of Public Welfare[17] in order to obtain voluntary inpatient treatment. The court found that this form, by its terms,

---

[17] A copy of this form is attached to this opinion as Appendix A.

contemplates that a patient sign it only *after* he or she has a treatment plan explained to him and is given a copy of the mandated Patient's Bill of Rights, which is a necessary precondition for voluntary treatment to begin. Consequently, the court held that completion of this form is required only as a later step in the voluntary admission process, *after* a medical professional has already examined the patient and determined that inpatient treatment is necessary. The court held that the first step was never taken in this case, because Appellants refused to treat Wise.

The court also found that Administrator alleged sufficient facts to raise a claim of gross negligence on Appellants' part through expert reports attesting that, based on Wise's specific complaints, his request for inpatient treatment should have, at the very least, been more thoroughly explored; therefore, the court upheld the trial court's decision refusing to enter summary judgment. Thereafter, Appellants filed separate petitions for allowance of appeal with our Court.

We granted review to consider the question of whether our Court's decision in *Leight II* should be interpreted as imposing a requirement that, in order for a third party to maintain a cause of action against a treatment provider under Section 114(a) for failing to provide voluntary inpatient treatment to a person who requests such treatment, the person must have formally initiated the process via a written application. *Matos v. Geisinger Medical Center*, 314 A.3d 512 (Pa. 2023) (order).

## II. Arguments

In considering this question, we begin with a recounting of the arguments of the parties.[18] Appellants first argue that the MHPA does not apply when care is sought by a person in an emergency room. Appellants postulate that what Wise was seeking when

---

[18] Although both Geisinger and Alley have filed separate briefs in this consolidated appeal, their arguments largely overlap; thus, where their arguments align, we will discuss them together.

he presented himself at these facilities was voluntary treatment as an outpatient; hence, as our Court recognized in *Leight II*, such voluntary outpatient care is, by the plain terms of Section 103, exempted from the scope of the MHPA inasmuch as it refers only to involuntary treatment of mentally ill persons rendered on either an inpatient or outpatient basis, and only voluntary inpatient treatment of mentally ill persons. Appellants acknowledge that the MHPA does not define "outpatient," nor does it categorize treatment in an emergency room as either inpatient or outpatient; however, they aver that Section 103.1[19] defines "inpatient" as "treatment that requires full or part-time residence in a facility." Geisinger Brief at 18 (quoting 50 P.S. § 7103.1); Alley Brief at 30. Appellants reason that, because Wise was only seen briefly in the emergency room and in doctors' offices, but never admitted, he never spent any time in residence at a treatment facility; thus, any treatment rendered to him in the emergency room or in doctors' offices must be classified as outpatient care and, therefore, exempted from coverage under the MHPA.

Appellants further aver that they cannot be held liable under Section 114(a), as they claim they did not participate in a decision that Wise be examined or treated under the MHPA. Appellants argue that *Leight II* established that physicians cannot be deemed to have participated in such a decision unless the specific prerequisite for initiating an evaluation under the MHPA has first been met. Appellants contend that the Superior Court erred in concluding that Section 201[20] establishes that prerequisite. Rather, they assert that Section 202[21] governs the process by which a person seeking voluntary

---

[19] 50 P.S. § 7103.1.
[20] *See supra* note 15.
[21] Section 202 provides:

> Application for voluntary examination and treatment shall be made to an approved facility or to the county administrator, Veterans Administration or other agency of the United States operating a facility for the care and treatment of mental illness. When application is made to the county administrator, he shall

(continued…)

treatment must initiate such treatment – namely, it requires an "application." They contend no such application was submitted, either by the treating physicians or by Wise.

Appellants assail the Superior Court's conclusion that, because Section 202 did not require a written application as does Section 302 for involuntary commitments, a verbal request is sufficient to initiate the voluntary treatment process. Appellants support their contention that a written request is required by noting that one of the MHPA's implementing regulations, 55 Pa. Code § 5100.72 ("Regulation" or "Regulation 5100.72"),[22] requires that a written application be submitted on behalf of a person seeking

---

designate the approved facility for examination and for such treatment as may be appropriate.

50 P.S. § 7202.

[22] This regulation provides, in relevant part:

§ 5100.72. Applications.

(a) Written application for voluntary inpatient treatment shall be made upon Form MH-781, issued by the Department.

* * *

(c) When application is made to an approved facility, the director of the facility shall:

(1) Be responsible for insuring that a preliminary evaluation of the applicant is conducted in order to establish the necessity and appropriateness of outpatient services or partial hospitalization or inpatient hospitalization service for the individual applicant. The preliminary evaluation shall be done in the least restrictive setting possible. The results of the preliminary evaluation shall be set forth on Form MH-781-A issued by the Department.

(2) Promptly notify the administrator if the applicant's treatment will involve mental health/mental retardation (MH/MR) funding.

(d) When application is made to the administrator:

(1) The administrator shall designate an approved facility which shall conduct a preliminary evaluation of the applicant in order to establish the necessity and appropriateness of outpatient services or partial hospitalization service or inpatient hospitalization for the individual applicant.

(continued…)

voluntary treatment. Appellants proffer that only Form MH-781[23] is sufficient to meet this requirement, given that it is the only form specifically referred to in subsection (a) of the Regulation.

Appellants further aver that this form must be completed *before* the treatment process may be undertaken, which it claims is evidenced by the language of subsection (c) of the Regulation that imposes a responsibility on the administrator of a facility to ensure that a preliminary evaluation of the applicant is conducted in order to establish the appropriateness of care, and then requires the results of that evaluation to be set forth on the form. Thus, Appellants contend that, because Wise never executed this form, the treatment process was not formally initiated, and liability under the MHPA did not attach.

Appellants advance additional policy arguments in favor of extending the bright-line "written application" requirement of *Leight II* to requests for voluntary commitment, given that, as our Court recognized in that case, the diagnosis and treatment of mentally ill people is uniquely challenging, and professional opinions regarding diagnoses and treatment can widely vary with respect to an individual patient. Appellants contend that

---

(2) The designated facility shall immediately upon its completion of the preliminary evaluation, notify the administrator of its finding and recommendations.
(3) Upon receipt of the report, the administrator shall review the report and when necessary, designate an approved appropriate facility for the recommended treatment of the individual applicant.

55 Pa. Code § 5100.72.

[23] Although the Regulation references both Form 781 and Form 781-A, they are references to the same form, inasmuch as the Department currently issues only Form 781. *See* https://www.pa.gov/content/dam/copapwp-pagov/en/dhs/documents/docs/publications/documents/forms-and-pubs-omhsas/MH%20781-Explanation%20of%20Voluntary%20Admission%20Rights.pdf.
The Regulation's reference to Form 781-A appears, therefore, to be an artifactual remnant of the form's prior designation within the Department's regulations. *See* 55 Pa. Code § 5100.41(b).

the immunity provisions of the MHPA advance the policy goal of ensuring mental health care services be available for those that need them by providing certainty to medical professionals who must make these difficult assessments by eliminating the need for speculation as to when their conduct might be subjected to liability under the MHPA. Appellants aver that allowing liability to attach every time a person appears at an emergency room requesting commitment would undermine that goal and lead to an increase in the number of individuals who are committed due to overcaution on the part of medical professionals. This, they claim, would contravene a foundational objective of the MHPA, which is to reduce the number of people involuntarily committed through the use of the least restrictive means of confinement.

Appellant Alley raises a separate argument based on the fact that, unlike Geisinger, as a walk-in clinic it was *solely* a provider of outpatient care, and it offered no inpatient care, as that term is defined in Section 103, on a voluntary basis or otherwise. Thus, in Alley's view, as a matter of law, it cannot be held liable under Section 114(a) for "participating in a decision that a person be examined or treated" under the MHPA for purposes of inpatient treatment, or for denying an application for such treatment, because it could not provide that type of treatment. Alley Brief at 30 (quoting Section 114(a)).

In his response, Administrator first reminds that we are reviewing a denial of a motion for summary judgment; hence, he is entitled to have the disputed facts regarding the degree to which Wise presented a danger to himself or others when he presented for voluntary inpatient treatment viewed in a light most favorable to him. He underscores that his expert reports established that the decision by Appellants to release him without conducting a more thorough examination amounted to gross negligence.

Administrator stresses that there are critical and dispositive differences between his case and *Leight II*. Administrator reminds that, in *Leight II*, the mentally ill shooter,

Shick, never sought voluntary inpatient treatment; rather, the plaintiff in that case argued only that Shick's treating physicians should have commenced the involuntary treatment process, but the process was never begun by those physicians, nor did they ever conduct an examination of Shick for mental health treatment purposes at any time. Instead, the physicians in *Leight II* treated Shick for only physical ailments. Moreover, Shick, unlike Wise herein, never sought voluntary commitment, and, in fact, actively resisted suggestions by his treating doctors that he do so.

By contrast, in the instant matter, Wise presented himself voluntarily for the *specific purpose* of obtaining inpatient mental health treatment, he repeatedly requested such treatment during his examinations, and the health care providers examined him to determine if inpatient treatment was necessary; hence, Administrator contends the protections of the MHPA were triggered, and his claim rests on the alleged gross negligence of Appellants' medical staff in failing to properly evaluate Wise and choosing to discharge him. Administrator asserts that, because his claim is based on alleged gross negligence attendant to the decision to deny Wise's application for voluntary commitment, doing so without proper examination, and then discharging him with no plan for treatment, this is the same type of negligent discharge claim which was raised in *Goryeb*, *supra*, and which we recognized therein was cognizable under Section 114(a).

Administrator supports his contention that, in cases where a person requests voluntary commitment, Section 201 requires only that the person "submit to a voluntary examination," which he argues that Wise indisputably did when he presented himself at the emergency room of both medical facilities and requested voluntary inpatient treatment for his deteriorating mental condition.

Further, Administrator renews his contention that the parties stipulated that Wise's visit to Appellants' emergency rooms constituted examinations under the MHPA and that

Appellants cannot now escape the consequences of that stipulation.[24]

Regarding the pivotal question of the mechanism by which the voluntary treatment provisions of the MHPA were triggered, Administrator strenuously disputes that execution of Form MH-781 is required by Section 201 or Section 202. Administrator argues that the Superior Court below was correct in recognizing that, unlike Section 302 governing involuntary commitments, neither of these provisions require a written application to begin the voluntary treatment process. Administrator avers that this difference in statutory language compels a different result than in *Leight II*. Administrator submits that execution of Form MH-781 is, as the Superior Court found, required only after a decision is made to commit the person for inpatient treatment, as it ensures that the person to be admitted understands and consents to the treatment program. Administrator points out that his claim concerns actions taken after Wise requested voluntary treatment under the MHPA, but was denied treatment through gross negligence; hence, Wise was never given the opportunity to execute Form MH-781, as no treatment program was ever developed for him. Administrator further emphasizes that conditioning the receipt of voluntary inpatient treatment on the proper execution of a specific form is unrealistic for people in a mental health crisis, given that they cannot be expected to complete such a form prior to coming to the emergency room, nor can they be reasonably expected to have the presence of mind to ask for such a form while they are in the emergency room. Indeed, Administrator

---

[24] In their reply briefs, Appellants deny that they stipulated to liability under the MHPA, but, rather, assert that they only stipulated that Section 114(a) applied insofar as it confers *immunity* on them; in any event, they argue that stipulations do not control our Court's legal interpretations of statutory provisions. Alley Reply Brief at 10-11; Geisinger Reply Brief at 11-12.

posits that such a rigid requirement is absurd, as it would result in automatic denials of treatment whenever forms are unavailable at a hospital.[25]

## III. Analysis

As discussed, this matter comes to our Court by way of an order denying summary judgment and involves the interpretation of various provisions of the MHPA, which is a comprehensive and sweeping reformation of our Commonwealth's laws governing the

---

[25] The following *amici* have filed briefs in support of Appellants: The American Medical Society and Pennsylvania Medical Society, the Hospital and Healthcare System of Pennsylvania, American College of Emergency Physicians and Pennsylvania College of Emergency Physicians, the Pennsylvania Coalition for Civil Justice Reform ("Coalition"), and UPMC.

These *amici* endorse Appellants' suggested interpretation of Section 114(a) as requiring a written request for voluntary treatment. As a matter of policy, *Amici* assert that the Superior Court decision would increase the specter of litigation resulting in more inpatient admissions as a precautionary measure. In turn, they postulate that this would drive up the cost of health care and discourage physicians from choosing psychiatry as a discipline, which would have deleterious consequences, given the already short supply of providers trained in this field. *Amici* also emphasize that there are effective alternatives to inpatient psychiatric care, and they contend that the purpose of the MHPA was to encourage use of those alternatives. They view the Superior Court decision in this case as undermining that objective, as they proffer that it incentivizes inpatient admissions. *Amici* consider it preferable, as a matter of providing much needed certainty to health care providers who are faced with making mental health evaluations, that we impose a strict requirement for a written request by an individual seeking inpatient care, identical to that which we already established for involuntary admissions in *Leight II*.

Additionally, the Coalition and UPMC sweepingly assert that our Court's long-standing recognition that Section 114(a) permits a cause of action for willful misconduct or gross negligence against providers involved in the examination or treatment of individuals under the MHPA is unsupported and contrary to legislative intent. The parties to this litigation do not raise this issue; thus it is not implicated in our disposition of this appeal. Nevertheless, we note that in the 34 years since our Court in *Goryeb* interpreted Section 114(a) as imposing liability on providers for willful misconduct or gross negligence, the General Assembly has taken no action to statutorily disapprove of this interpretation. *See generally Verizon v. Commonwealth*, 127 A.3d 745, 758 (Pa. 2015) (observing that the General Assembly is "quite able to address what it believes is a judicial misinterpretation of a statute," and, if it declines to do so, that is indicative of its satisfaction with that interpretation (internal citation and quotation marks omitted)).

treatment of those afflicted by severe mental illness, enacted in 1976.[26] Our review involves pure questions of law, and so our standard of review is *de novo*, and our scope of review is plenary. *Sythes USA v. Commonwealth,* 289 A.3d 846 (Pa. 2023); *Salsberg v. Mann*, 310 A.3d 104, 117 (Pa. 2024).

As our Court has oft emphasized, when interpreting a statute, our "principal objective . . . is to give full effect to the General Assembly's intent." *Mimi Investors, LLC v. Tufano*, 297 A.3d 1272, 1284 (Pa. 2023) (citing 1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.")). The legislative will "is revealed, first and foremost, by the explicit text of a statute." *Id*. If the language of a statute "is 'clear and free from ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.'" *Sayles v. Allstate Ins. Co.*, 219 A.3d 1110, 1123 (Pa. 2019) (quoting 1 Pa.C.S. § 1921(b)). Consequently, "when the words of a statute have a plain and unambiguous meaning, it is this meaning which is the paramount indicator of legislative intent." *Id.* (internal citation and quotation marks omitted).

An equally important principle of statutory interpretation applicable in this regard is that "statutory language must be read in context, that is, in ascertaining legislative intent, every portion of statutory language is to be read together and in conjunction with the remaining statutory language, and construed with reference to the entire statute as a whole." *Commonwealth v. Office of Open Records*, 103 A.3d 1276, 1285 (Pa. 2014) (internal quotation marks omitted). Accordingly, all sections of a statute should be read together in "context as part of the overall statutory scheme." *Commonwealth v. Giulian*, 141 A.3d 1262, 1269 (Pa. 2016).

---

[26] *See generally Paul A. Lundeen, Pennsylvania's New Mental Health Procedures Act: Due Process and the Right to Treatment for the Mentally Ill*, 81 Dickinson Law Review 627 (1977).

We turn now to the text of the provisions of the MHPA which govern resolution of this issue. The first of these provisions is Section 102, which forms the basis for interpreting the other provisions. To reiterate, this provision provides, in pertinent part:

> It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected. The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others. Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed.

50 P.S. § 7102.

The General Assembly has, thus, articulated in Section 102 two clear policies: to assure the availability of adequate voluntary or involuntary treatment for persons who are mentally ill; and to further the Commonwealth's solemn duty to protect both the individual afflicted by mental illness, and the welfare of other people who are at risk from that individual. *In re Hutchinson*, 454 A.2d 1008, 1010-11 (Pa. 1982); *see also Leight II*, 243 A.3d at 130 ("The legislature, through the MHPA, and in conformity with principles of due process, sought to assure the availability of voluntary and involuntary treatment 'where the need is great and its absence could result in serious harm to the mentally ill person or to others.'" (quoting Section 102)).

The scope of the MHPA is delineated by Section 103, which states:

> This act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons.

50 P.S. § 7103. The MHPA contains no definition of the term "outpatient treatment"; however, it defines "Inpatient treatment" as "[a]ll treatment that requires full or part-time residence in a facility." *Id.* § 7103.1.

The MHPA specifically distinguishes between voluntary inpatient treatment and involuntary inpatient treatment: voluntary inpatient treatment is addressed in Article II, §§ 201 to 207, and involuntary inpatient treatment in Article III, §§ 301 to 306.

Section 201 describes the people "who may authorize voluntary treatment," providing:

> Any person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary treatment may submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily. A parent, guardian, or person standing in loco parentis to a child less than 14 years of age may subject such child to examination and treatment under this act, and in so doing shall be deemed to be acting for the child. Except as otherwise authorized in this act, all of the provisions of this act governing examination and treatment shall apply.

*Id.* § 7201.

The statutorily prescribed method an individual seeking voluntary inpatient treatment is set forth in Section 202 of the MHPA which provides:

> Application for voluntary examination and treatment shall be made to an approved facility or to the county administrator, Veterans Administration or other agency of the United States operating a facility for the care and treatment of mental illness. When application is made to the county administrator, he shall designate the approved facility for examination and for such treatment as may be appropriate.

50 P.S. § 7202.

Lastly, Section 114(a), "protects from civil and criminal liability those parties that examine and provide treatment to mentally ill patients under the MHPA." *Leight II*, 243

A.3d at 140. However, as previously mentioned,[27] we have construed Section 114(a) to create, by implication, "an affirmative duty" requiring "mental health professionals and institutions to avoid willful misconduct or gross negligence in the treatment of mental health patients, and imposes civil liability for a breach of that duty." *Id.* at 130; *Goryeb,* 575 A.2d at 548-49. Section 114(a) states in full:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114(a).

We begin by addressing Appellants' threshold contention that the examinations of Wise at their treatment facilities constituted only outpatient treatment and, thus, under our decision in *Leight II*, they were excluded from the scope of the MHPA. *See Leight II*, 243 A.3d at 140 (treatment actions conducted on a voluntary outpatient basis "clearly fall outside the coverage of the MHPA"). We reject this contention, as it is unsupported by the plain language of the MHPA.

Initially, we observe that "voluntary inpatient treatment of mentally ill persons" is explicitly within the scope of Section 103. Although, as noted above, the MHPA does not define the terms "voluntary inpatient treatment," it does define "inpatient treatment" as "[a]ll treatment that requires full or part-time residence in a facility." 50 P.S. § 7103.1.

---

[27] *See supra* at n.7.

Moreover, and critically, Section 104 additionally specifies that "treatment shall include *diagnosis, evaluation*, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery." *Id.* § 7104 (emphasis added).

The term "voluntary" is not otherwise defined by the MHPA and, hence, must be given its ordinary and common meaning, which may be discerned by consulting dictionaries. *Ursinus v. Prevailing Wage Appeals Board*, 310 A.3d 154, 171 (Pa. 2024); *Commonwealth v. Hart*, 28 A.3d 898, 903 (Pa. 2011). The widely accepted definition of "voluntary" means "proceeding from one's own free choice or consent." *See Merriam Webster's Dictionary of Law* 527 (1996); *see also Random House Webster's Unabridged Dictionary* 2131 (2d. ed. 2000) (defining "voluntary" as "done, made, brought about, undertaken etc. of one's own accord or by free choice"). Thus, reading Sections 103 and 104 together, we interpret "voluntary inpatient treatment," as used in Section 103 to include a person's volitional act of requesting evaluation or diagnosis for the purpose of obtaining inpatient care for mental illness.

Such a volitional act of requesting inpatient treatment at a facility commences the entire voluntary inpatient treatment process and, thus, must be considered an integral part of that process. This conclusion is buttressed by Section 114(a), which provides liability for willful misconduct or gross negligence by an "authorized person who participates in a decision that a person be examined or treated under [the MHPA]" or when that person "denies an application for voluntary treatment." 50 P.S. § 7114(a). *See also Leight II*, 243 A.3d at 140 ("Section 114 creates a cause of action upon a showing of

willful misconduct or gross negligence against an individual for, *inter alia, participating in a decision that a person be examined or treated under the MHPA*[.]" (emphasis added)); *Goryeb, supra*. This section makes plain the General Assembly's intent that the duty of medical personnel with respect to individuals seeking voluntary inpatient treatment begins at the time the individual initiates the examination and treatment process by requesting inpatient treatment from an approved facility, which will then conduct an examination and decide whether inpatient admission is warranted, and, if so, what treatment will be employed after the individual's admission.[28]

The factual record in this matter, viewed in a light most favorable to Administrator, indicates that Wise requested voluntary inpatient treatment when he presented himself to the emergency room at Geisinger and requested admission to treat his intense mental distress, and Geisinger examined him to evaluate his request. Further, having been rebuffed by Geisinger, the record indicates that Wise renewed his request to receive inpatient admission with his physicians at Alley who had been treating him for his mental illness.

---

[28] It appears the dissent interprets these statutes to require a person seeking voluntary inpatient treatment to meet three conditions – to execute a written application, to execute a written consent, and to then be admitted into a facility for treatment – before liability can attach. *See, e.g.,* Dissenting Opinion (Wecht, J.) at 27 ("[T]o become a voluntary inpatient, the Act requires all of the processes detailed above, including an application, consent, and acceptance."). However, such an interpretation imposes requirements beyond those the General Assembly has established. *See* 50 P.S. § 7114(a) (imposing liability for willful misconduct or gross negligence, *inter alia*, on "a county administrator or other authorized person who *denies an application* for voluntary treatment" (emphasis added)). Indeed, as Administrator has highlighted, Administrator Brief at 36, an interpretation such as that favored by the dissent would effectively insulate those conducting the examination process from liability merely by rejecting an individual's request for voluntary inpatient treatment. Again, such a result is contrary to the legislative design.

Contrary to Alley's assertion, the record at this stage of the litigation does not show that Wise was requesting that he be admitted *to* Alley. Rather, the record supports the conclusion that Wise, who was by then hallucinating and expressing alarm that he was going to snap, along with his father, were desperately seeking an evaluation and diagnosis from his physicians at Alley to assist in having Wise admitted as an inpatient at *any* suitable facility. Alley, like Geisinger, performed the requested evaluation and, thus, also engaged in the process of providing voluntary inpatient treatment in accordance with Section 103. The fact that Alley did not itself provide inpatient mental health treatment within its own facility is of no consequence for purposes of determining whether its actions were within the scope of the MHPA, as the statute does not require the facility at which an individual is requesting evaluation for voluntary inpatient care to actually provide such care. Rather, it is sufficient that the facility "provides for the *diagnosis*, treatment, care or rehabilitation of mentally ill persons, whether as *outpatients or inpatients*." *Id.* § 7103.1 (emphasis added). It is reasonable to expect that a facility which offers such professional mental health diagnostic services on an outpatient basis is capable of arranging for appropriate voluntary inpatient care with a suitable provider if the facility's medical personnel determine it is warranted. Consequently, we conclude that, because both Geisinger and Alley examined and evaluated Wise in response to his request for voluntary inpatient mental health treatment, their actions were within the scope of Section 103.

Furthermore, Appellants' corollary claim — that Section 114(a) is inapplicable herein because they did not "participate" in an "examination of Wise," as there was no *written* request for such a voluntary examination — is unavailing. The requirements for initiating the voluntary inpatient treatment process are set forth in Sections 201 and 202.

Section 201 allows "[a]ny person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary treatment" to "submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily." *Id.* § 7201. Section 202 requires that "[a]pplication for voluntary examination and treatment shall be made to an approved facility." *Id.* § 7202.[29]

As the Superior Court concluded, neither Section 201 nor Section 202 textually mandate that an individual seeking voluntary inpatient treatment at such facilities apply in writing. Section 201 simply requires that a person "submit to a voluntary examination," and Section 202 merely directs that the person make an "application" to a facility for such examination. The plain meaning of the term "application," as it was understood when used in the legal context in 1976 at the time the MHPA was enacted, is "[a] putting to, placing before, preferring a request or petition to or before a person. The act of making a request for something." *See Application*, Black's Law Dictionary 127 (4th ed. Rev. 1968); *see also Application*, Merriam Webster's Dictionary of Law, (1996) (defining application as "a request for action or relief . . . *also* a form used to make such a request.") (emphasis added). But the term is used to include both oral and written requests. *See Application*, Random House Webster's Unabridged Dictionary 102 (2d. ed. 2000) (defining application as "a written or spoken request or appeal for . . . help" ). Thus, in accordance with its plain meaning, we conclude an application for voluntary inpatient

---

[29] The record reflects that Geisinger as a hospital and Alley as a medical clinic both treated mentally ill persons, which Wise's own prior treatments for schizophrenia by those entities demonstrated, and, thus, each meets the statutory criteria for a facility as that term is defined in Section 103.1. Neither presently disputes that classification.

mental health treatment as used in Section 202 means *either* an oral or written request for such treatment.

Moreover, this straightforward interpretation best effectuates the paramount objective of the General Assembly in enacting the MHPA, which is to ensure the availability of quick and efficacious treatment for persons experiencing a serious mental health crisis in order to prevent harm to that person or others. *See* 50 P.S. § 7102 ("The provisions of this act shall be interpreted in conformity with the principles of due process to make *voluntary* and involuntary *treatment* available where *the need is great and its absence could result in serious harm to the mentally ill person or to others*." (emphasis added)).

In this regard, it is noteworthy to contrast the requirements of Section 302, which were at issue in *Leight II*, with Section 202.[30] As we held therein, Section 302 specifies that the involuntary commitment process may be initiated only through the filing of a certification by a physician; a warrant issued by the county administrator authorizing such examination; or an application by a physician or authorized person who has personally

---

[30] *Leight II* does not, as a general matter, control our analysis of the provisions of the MHPA governing voluntary commitment at issue in this case, inasmuch as we expressly recognized therein that the plaintiffs in that case did not claim that physicians had engaged in any negligent conduct with respect to examining or treating the mentally ill individual on a voluntary inpatient basis. *Leight II*, 243 A.3d at 149. Unlike Wise herein, Shick did not seek such treatment, and, in fact, refused to engage in any type of voluntary treatment.

The dissent suggests that our citation in *Leight II* to *Fogg v. Paoli Memorial Hospital*, 686 A.2d 1355 (Pa. Super. 1996), supports his contention that "simply presenting oneself at an emergency room does not establish treatment under the Act." *See* Dissenting Opinion (Wecht, J.) at 21. This position disregards the critical differentiating fact that Wise, unlike the individual in the grip of a psychotic episode in *Fogg*, did more than merely show up in the emergency room: he *affirmatively and repeatedly* requested the medical personnel who examined him to admit him for inpatient mental health care.

observed actions indicating a need for an emergency application. *Leight II,* 243 A.3d at 140. As we further held, based on our construction of Section 302, all three of these methods require the execution of written documents by a third person attesting to the need for involuntary treatment. *See id.* at 141 ("It is only when a physician files the required documentation for involuntary emergency examination that he becomes a participant in the decision-making process under the Act.").

Thus, in crafting Section 302, the legislature was clear that a person cannot be involuntarily committed unless one of these statutorily prescribed written requirements are met. These requirements are conspicuously absent from Section 202. As our Court has reminded, "[a]s a matter of statutory interpretation, although 'one is admonished to listen attentively to what a statute says [;][o]ne must also listen attentively to what it does not say.'" *Kmonk-Sullivan v. State Farm Mut. Auto. Ins. Co.,* 788 A.2d 955, 962 (Pa. 2001) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L.Rev. 527, 536 (1947)). Accordingly, we deem the General Assembly's omission of any written application requirement in Section 202 as a deliberate decision that the execution of a written application form by a person seeking voluntary inpatient treatment is not necessary.[31]

---

[31] We also reject Appellants' assertion, endorsed by the dissent, *see* Dissenting Opinion (Wecht, J.) at 10-13, that, because Section 110(a) of the MHPA requires that "all applications, petitions, and certifications required under the provisions of [the MHPA] shall be made subject to the penalties provided under 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities) and shall contain a notice to that effect," 50 P.S. § 7110(a), this indicates that the legislature intended that any application under Section 202 must be made on a written form. This assertion is belied by the restrictive scope of Section 110.

Section 110 is entitled "*Written applications,* petitions, statements and certification," and subsection (a) specifically indicates that it is intended to apply only to (continued…)

Indeed, the imposition of an extra-statutory burden of completing a written form on individuals voluntarily seeking inpatient treatment, at a time when they are likely suffering extreme distress and confusion, where the legislature made a considered policy choice *not* to require the completion of such a form as a precondition for treatment, would thwart that body's clear intent to reduce barriers for accessibility to such treatment as expressed in Section 102 of the MHPA. *See* 50 P.S. § 7102.

---

these specifically enumerated types of written instruments if they are "required under the provisions of [the MHPA]." 50 P.S. § 7110(a) (emphasis added). We interpret Section 110(a), consistent with the plain language of this section's title and text, to mean a "written application" that is otherwise *required* by the MHPA, such as when "a physician or other authorized person" is seeking the issuance of a warrant to have a person subjected to involuntary examination under Section 302(a)(1). *See* 50 P.S. § 7302(a)(1) ("Warrant for Emergency Examination.--*Upon written application* by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant." (emphasis added)). However, as we have explained, Section 202, by its plain terms, does not require a written application form; thus, Section 110(a) does not apply to independently impose such a requirement.

Regarding Section 110(c), it simply states that the requirements of Section 110(a) and (b) "shall not apply to patients admitted pursuant to Article II [50 P.S. §§ 7201 *et seq*.] when no part of the patient's care is provided with public funds." 50 P.S. § 7110(c) (footnote omitted). This section arguably implies that the requirements of Sections 110(a) and (b) *do* apply to all written documents relating to voluntary admissions of individuals whose treatment is being provided with public funds. Once more, however, the use of such written documents must be mandated by the provisions of Article II. *See, e.g.*, 50 P.S. § 7206(b) (allowing "any responsible party" who "believes that it would be in the best interest of a person under 14 years of age in voluntary treatment to be withdrawn therefrom or afforded treatment constituting a less restrictive alternative, such party may file a *petition* in the Juvenile Division of the court of common pleas for the county in which the person under 14 years of age resides, requesting a withdrawal from or modification of treatment"); 50 P.S. § 7203 (requiring that a person being accepted for voluntary inpatient treatment be given *a written consent form and statement of his rights*). Again, because Section 202 does not require the use of a written application to obtain voluntary inpatient treatment, Section 110(c) does not impose such a requirement.

Appellants' related claim, which the dissent adopts, *see* Dissenting Opinion (Wecht, J.) at 17-18, that only the use of Form MH-781 implements the MHPA's requirements for the initiation of the voluntary treatment process based on their reading of an administrative rule promulgated by the Department of Human Services — Regulation 5100.72[32] — is likewise unpersuasive. Subsection (a) of this Regulation provides that "Written application for voluntary inpatient treatment shall be made upon Form MH-781, issued by the Department." 55 Pa. Code § 5100.72(a). This provision does not mandate that *only* a written application may be used to request voluntary inpatient treatment; rather, it requires that, *if* a written application is used, then it must be Form MH-781. Indeed, subsection (c) of this Regulation, governing application to an approved facility such as the ones run by Appellants, does not use the term "written application," but merely requires an "application" to commence the voluntary treatment process. *Id.* § 5100.72(c) ("When application is made . . . .").

Even assuming *arguendo* that Appellants' and the dissent's reading of the Regulation – to require all voluntary inpatient treatment applications to be written – is correct, such an interpretation would conflict with Sections 201 and 202, and so must yield. *See Terminato v. Pennsylvania Nat. Ins. Co.*, 645 A.2d 1287, 1293 (Pa. 1994) ("Although an interpretation of a statute by an administrative agency is entitled to great weight, the interpretation may be disregarded if the interpretation is clearly erroneous or

---

[32] *See supra* note 22.

inconsistent with the statute under which the regulation is promulgated."); *Gardner v. W.C.A.B. (Genesis Health Ventures)*, 888 A.2d 758, 767 (Pa. 2005) (same).[33]

Once an application is made, this triggers the next requirement of Rule 5100.72: that a preliminary evaluation of the applicant be conducted "in the least restrictive setting possible," to determine if outpatient mental health services, or partial or total inpatient hospitalization, is required for the applicant. 55 Pa. Code § 5100.72(c)(1). The results of that evaluation must then be set forth on MH-781, and if public health money is to be expended in the treatment of the applicant, the county mental health administrator must be notified. *Id.*

As the Superior Court observed, a fair reading of Form MH-781, notably entitled "Consent For Voluntary Inpatient Treatment," reveals it is designed to be executed only *after* a decision has been made by a physician to admit a person who has applied for treatment at a facility and *after* a suitable treatment plan is developed. *See, e.g.*, Form MH-781 at 1 ("BEFORE SIGNING THIS FORM, *YOUR TREATMENT SHOULD BE EXPLAINED TO YOU* AND YOU MUST BE GIVEN A COPY OF THE PATIENT'S BILL OF RIGHTS."); *id.* ("*I consent to the treatment which has been explained to me* including the types of medication, examination procedures . . . ."). Form MH-781 appears, then, to address the steps required by Regulation 5100.72 only after an initial application for voluntary inpatient treatment has been made, and prior to the person's admission into the facility.

---

[33] In this regard, we observe that, in discussing the requirements of the Act, the dissent interweaves statutory citations and regulatory citations, as if they are of equivalent authoritative weight. *See* Dissenting Opinion (Wecht, J.) at 30-31.

Indeed, the structure of this form supports this conclusion, as it is manifestly unsuitable for use by an individual who is making an application for voluntary inpatient treatment, because it contains no place for an individual to set forth the reasons why he or she is requesting such treatment. Rather, the form allows only for writings under the heading "Initial Evaluation And Treatment Plan"; the written entry of "Initial Findings," which are made by a mental health professional after performing an examination to determine if voluntary *inpatient* treatment is warranted; a "Description of Proposed Treatment Plan"; and a "Description of Proposed Restrictions and Restraints." Form MH-781 at 2.

Likewise, Form MH-781 seems designed to fulfill the requirement of Section 203 that consent be obtained after the predicate evaluation has been completed, and a treatment plan crafted, as Section 203 provides:

> Before a person is accepted for voluntary inpatient treatment, an explanation shall be made to him of such treatment, including the types of treatment in which he may be involved, and any restraints or restrictions to which he may be subject, together with a statement of his rights under this act. Consent shall be given in writing upon a form adopted by the department. The consent shall include the following representations: That the person understands his treatment will involve inpatient status; that he is willing to be admitted to a designated facility for the purpose of such examination and treatment; and that he consents to such admission voluntarily, without coercion or duress; and, if applicable, that he has voluntarily agreed to remain in treatment for a specified period of no longer than 72 hours after having given written notice of his intent to withdraw from treatment. The consent shall be part of the person's record.

50 P.S. § 7203. Critically, Section 203 does not require execution of any type of written consent as a precondition for an individual to *seek* the preliminary examination necessary to determine if voluntary inpatient treatment is appropriate.

For all of the aforementioned reasons, we hold that, under the MHPA, an individual's act of presenting himself to an approved facility and orally requesting admission for voluntary inpatient treatment is sufficient to constitute an application for voluntary inpatient treatment for purposes of the MHPA, such that Section 114(a) imposes liability on health care providers for willful misconduct or gross negligence in denying such treatment.[34]  Accordingly, we affirm the order of the Superior Court.

Order affirmed.  Jurisdiction relinquished.

Justices Donohue, Dougherty, Mundy, Brobson and McCaffery join the opinion.

Justice Wecht files a dissenting opinion.

---

[34] Although the dissent suggests our straightforward application of the statutory language of the MHPA in this matter "will lead to unnecessary litigation that strives to resolve the point at which certain conduct falls within the MHPA's scope," Dissenting Opinion, Wecht J. at 27, we respectfully disagree.  The liability of the provider under the MHPA is not boundless as the dissent seems to suggest, but rather has been circumscribed by the General Assembly through Section 114, which allows the imposition of liability on the provider only in the event he or she engages in willful misconduct or gross negligence in examining and evaluating the individual for requested treatment, a standard which requires more than mere negligence on the part of the provider.

We must also reject the suggestion of the dissent that our holding somehow gives insufficient regard for due process protections afforded a mentally ill person by the MHPA, which protections are of utmost importance.  To the contrary, the constellation of due process protections afforded an individual once he or she makes an application for a voluntary inpatient commitment under the MHPA include:  an examination of the individual by a mental health professional to determine if such inpatient treatment is warranted, 50 P.S. § 7201; a careful explanation by that mental health professional to the individual of any proposed inpatient treatment plan and the necessity of obtaining the individual's informed consent before the treatment plan is implemented for the individual, *id.* § 7203; and the opportunity of the individual to terminate the voluntary commitment prior to the completion of the plan, *id.* § 7206.  These protections reserve to the individual applying for a voluntary mental health commitment the ultimate choice to accept or reject any unwanted restraints on his or her liberty interests which may be imposed as part of that treatment process.  Our holding does nothing to undermine them.

## APPENDIX A

## CONSENT FOR VOLUNTARY INPATIENT TREATMENT

| NAME OF PATIENT | LAST | FIRST | MIDDLE | AGE | SEX |
|---|---|---|---|---|---|
| NAME OF COUNTY PROGRAM | | NAME OF BASE SERVICE UNIT | | BASE SERVICE UNIT NUMBER | |
| NAME OF FACILITY | | ADMISSIONS DATE | | ADMISSIONS NUMBER | |

### INSTRUCTIONS
**BEFORE SIGNING THIS FORM, YOUR TREATMENT SHOULD BE EXPLAINED TO YOU AND YOU MUST BE GIVEN A COPY OF THE PATIENT'S BILL OF RIGHTS. THE REPORT OF YOUR INITIAL EVALUATION AND THE PROPOSED TREATMENT PLAN MUST BE COMPLETED AND SIGNED BY YOU AND THE PHYSICIAN.**

### VOLUNTARY CONSENT TO INPATIENT TREATMENT

For the above-named person who is:  ☐ an adult 18 years of age or older or

☐ a person who is at least 14 years of age and not yet 18 years old

I consent to the treatment which has been explained to me including the types of medication, examination procedures and the types of restrictions which are applicable; and

I understand that in order to leave before I am discharged, I must give _____ hours advance notice in writing to those in charge of my treatment; and (UP TO 72)

I confirm that my rights and responsibilities while a patient in this hospital have been explained to me.

_____          _____
SIGNATURE OF PATIENT                                    DATE OF SIGNATURE

For the above-named person who is:  ☐ under 14 years of age

I consent to the treatment of my child or ward which has been explained to me including the types of medication, examination procedures and the types of restrictions which are applicable; and

I understand that in order to take my child or ward out of the hospital before he or she is discharged, I must give _____ hours advance notice in writing to those in charge of the patient's treatment; and (UP TO 72)

I confirm that the rights and responsibilities for myself and my child or ward while a patient in this hospital have been explained to me.

_____          _____
SIGNATURE OF:                                            DATE OF SIGNATURE

☐ PARENT OR

☐ GUARDIAN

_____
PRINT NAME OF PERSON SIGNING ABOVE

MH 781  5/14

# INITIAL EVALUATION AND TREATMENT PLAN

INITIAL FINDINGS:

DESCRIPTION OF PROPOSED TREATMENT PLAN:

DESCRIPTION OF PROPOSED RESTRICTIONS AND RESTRAINTS:

_____
SIGNATURE OF PHYSICIAN/DATE

_____
SIGNATURE OF CLIENT/PARENT/OR GUARDIAN/DATE

Any person who knowingly provides any false information when he/she completes this form may be subject to prosecution.

MH 781  5/14